## UNITED STATES v. DEWEY COUNTY, S. D.

(District Court, D. South Dakota. June 14, 1926.)

I. **Constitutional law** ☞68(1)—**Indians** ☞5—**Guardianship of United States over Indians can be terminated only by act of Congress.**

When the guardianship of the United States over Indians terminates is a political matter, to be determined by Congress, and over which neither the courts nor a state has any power.

2. **Indians** ☞5—**Conferring of citizenship and political rights on Indians by a state does not terminate guardianship of the United States.**

Neither the ownership of lands in fee in severalty by Indians, nor the conferring of citizenship and political rights upon them by a state, is incompatible with continuance of their tribal relations, or with continued guardianship over them by the United States.

3. **Indians** ☞13—**Statutes authorizing issuance of patents in fee for allotments to competent Indians do not emancipate them from general guardianship of United States.**

Provisions of the several acts of Congress authorizing the Secretary of the Interior, when satisfied that an Indian allottee is competent to manage his affairs, to terminate the trust under which the allotment is held and issue him a patent in fee, does not effect a termination of the general guardianship of the United States over him, but merely releases him from guardianship with respect to the particular land involved.

4. **Indians** ☞27(1)—**United States held entitled to maintain suit against county for recovery of taxes illegally collected from Indians.**

Members of the Cheyenne River band of Sioux Indians, owning lands in severalty and in fee within the original limits of the Cheyenne

River reservation, but who were also enrolled as members of the tribe, which was in charge of a government agent, and entitled to participate in tribal funds and rents and profits of tribal lands, *held* still wards of the United States government, which had the right to maintain suit on their behalf against a county to recover personal property taxes illegally assessed against and collected from them.

**5. Indians ⬤➔27(1)—United States may maintain suit to recover taxes illegally collected from its Indian wards, though paid without protest.**

The rule that taxes voluntarily paid cannot be recovered back may not be invoked to defeat a suit by the United States to recover taxes illegally collected from its Indian wards.

**6. United States ⬤➔133.**

Laches may not be invoked to defeat a suit brought by the United States in the public interest.

**7. Taxation ⬤➔538—Payment of illegal taxes, coerced because made by statute a lien on lands, was not voluntary.**

Illegal personal property taxes assessed against Indians, payment of which was coerced by carrying the same on the records as liens on their lands, cannot be said to have been paid voluntarily.

In Equity. Suit by the United States against Dewey County, S. D. Decree for the United States.

P. J. Tscharner, Asst. U. S. Atty., of Rapid City, S. D., and Howard G. Fuller, of Pierre, S. D., for the United States.

Frank McNulty, of Aberdeen, S. D., for defendant.

ELLIOTT, District Judge. I have duly considered the issues presented in Re United States of America v. Dewey County, S. D., a municipal corporation. It appears from the pleadings that this is an action brought by the United States against Dewey county, to recover for the following named Indians, Miller, Garreau, Burguier, La Plant, Miner, Ducheneaux, and Counting, members of the Cheyenne Indian River Tribe of Sioux Indians, moneys paid for personal taxes alleged to have been illegally assessed against these Indians, respectively, upon personal property theretofore issued to such Indians by the government of the United States.

There is no real dispute upon the facts, the defendant contesting only the conclusions of law drawn by the master from the facts found. Perhaps it should be stated here that there is no exception filed to any finding of fact, and a review of the record demonstrates the correctness of such findings.

Finding 1, in substance, is that the defendant Dewey county is a regularly organiz-

ed and existing county under the laws of the state of South Dakota, forming a part of this state.

Finding 2, in substance, is that Miller, Garreau, Burguier, La Plant, Miner, Ducheneaux, and Counting are now, and at all times mentioned in the complaint herein were, members of the Cheyenne River Tribe of Sioux Indians, in the state of South Dakota, and that each of the persons above named had been, within the time mentioned in the complaint, allotted lands in Dewey county, S. D., and that trust patents had been issued to each of such persons under the provisions of the Act of Congress dated February 8, 1887, known as the Dawes Act (24 Stat. 388 [Comp. St. § 4195 et seq.] and Act of May 8, 1906, known as the Burke Act (34 Stat. 182 [Comp. St. §§ 3951, 4203]).

Then follows a finding that these Indians, respectively, received and accepted patent in fee simple from the United States to the descriptions of land theretofore allotted to them upon this Indian reservation, and that said land upon which they lived was, a portion of it, within the Cheyenne River Indian reservation, and as to others of these parties named, was within the diminished Cheyenne River Indian reservation. That one of the Indians, named Counting, received from the United States and accepted patent in fee simple to other lands, known as heirship lands, which he inherited from a deceased child, which land was located outside of the limits of the diminished portion of the Cheyenne River Indian reservations, but within the boundaries of the old reservation. That all of said Indians at all times named in the complaint, and for a long time prior thereto, appeared on the rolls of said tribe at the Cheyenne River Indian agency, as members of said band, and they are entitled to partake of and to participate in all tribal funds, and to the rents and profits of all tribal lands.

Finding 3, in substance, states that the duly authorized officers of the defendant, Dewey county, listed, assessed and returned on the tax rolls of said Dewey county, certain personal property against these Indians, respectively, giving the amount of the tax assessed for each year, respectively, and the property upon which it was assessed. It was further found that this assessment and tax against these Indians, respectively, remained upon the tax records in the office of county treasurer of the defendant county, until such time, named in the finding, as the said tax, together with interest and penalty thereon, was paid by the Indians, respectively. The finding stating the amount paid and the time

paid as to each of the Indians named, and further stating that an original duplicate treasurer's receipt was issued to them for the amounts paid by them, respectively, upon the date the payments were made. That a part of said receipts were marked "Paid under protest," and others were not so marked. The finding further shows that all of the property assessed to these Indians, respectively, by said county, was issue property or the increase of such property.

Then follows a finding as to each of the Indians that, after getting title to the allotment, they desired to either mortgage the land or to sell the same. There is a further finding that it has been the custom of the abstractors of the defendant county to show the personal property tax levied and assessed against personal property on abstracts of lands owned by any Indians on the Cheyenne Indian reservation, within the limits of said Dewey county, prior to May 16, 1922, and that no personal property tax levied and assessed against Indians were shown on abstracts subsequent to May 16, 1922.

That on February 8, 1922, the board of county commissioners of Dewey county, S. D., adopted and spread on its records, resolution recognizing the invalidity of taxes upon the personal property of these Indians that had been issued to them by the government; that the same ought to be canceled and abated, and thereupon passed resolution abating and canceling of record all the said Indian taxes which are illegally or improperly assessed against said Indians, and that this abatement shall be made by the county board under proper petition to the board being filed with the county auditor, by the superintendent of the Cheyenne River agency or the individual Indian who has been assessed and against whom the tax is levied.

The master then finds that the terms of section 6758, Revised Code of South Dakota (1919), relating to taxes on real and personal property, provides as follows:

"Taxes upon real property shall be a perpetual lien thereon against all persons and bodies corporate, except the United States and this state, and taxes due from any person upon personal property shall be a lien upon any real property owned by such person, or to which he may acquire title."

Then follows the provision that the same shall not be enforced against real property until after the filing of the county treasurer's return, and further that all taxes shall become due on the 1st day of January of the year following that in which it is assessed, and providing the tax lien application of vendor and vendee.

The section then provides that nothing in the article shall be so construed as to prevent the county treasurer from advertising the amount of taxes due on personal property and selling the real property which would be liable for the same if uncollected or uncollectible from the personal property of the person assessed, and providing, further, that personal property taxes shall cease to be a lien upon real property on and after the expiration of a period of 10 years after the date upon which such personal property taxes became due.

Then follows a finding of the provisions of section 2185 of the Revised Code of South Dakota (Pol. Code), which has to do with the treasurer making a list of delinquent personal property taxes, and certifying the same to the sheriff for collection, and providing that the sheriff shall file the list in his office and proceed to collect, with provisions for fees, manner of collection, form of receipt, etc.

The master then by finding 12 finds, as a matter of fact, that it was the custom of all of the banks and banking officers and others engaged in the loaning of moneys to the Indians in said Dewey county, during the years involved in this suit, from 1912 to 1918, inclusive, to advise the Indians that the abstract of lands given to secure loans would have to show clear title, and that these taxes must be paid in order that they should be able to obtain a loan.

Finding 13 is, in substance, that during the time mentioned and described in the complaint the duly elected and qualified treasurer of Dewey county sent printed notices of taxes due on personal property to all of the Indians named herein, so taxed and residents in said county, giving the form of the notice; that this notice was not in form required by law, but was sent out by the officers as a demand for the payment of the tax.

Finding 14 is, in substance, that large numbers of the Indians were then members of the Cheyenne band of the Sioux Tribe of Indians, and voted at the general election held in that county during the year 1913 and subsequent years, and that Indian children attended the public schools in that county quite generally since 1910; that the public schools were open to such Indian children as desired to attend the same; that no discrimination was made in the schools of the county against Indian children; that roads and highways to some extent were constructed in that part of the county in which the Cheyenne River Indian reservation is located and is quite generally occupied by members of said tribe; that the state courts of the county were open to

Indian litigants, and the Indians were not restricted or discriminated against by the courts.

Finding 15 is, in substance, that all of the property owned by these Indians named in the complaint, assessed by the taxing officers of the defendant, and upon which said taxes were carried forward as liens against the allotments of these Indians, respectively, and were paid by them after they had received their patent in fee therefor, were one of eight classes of property named in the finding, neither of which is property subject to taxation,

Finding 16 is that as a matter of fact the following stipulation was entered into and made a part of the record:

"Stipulation.—It is further stipulated and agreed that this case is being tried as a test case as to the rights of approximately 160 Indians, to recover a total sum of approximately $10,000, paid Dewey county as taxes upon personal property during certain years, prior to 1916, and that the cases described in the pleadings and testimony have been selected as representative from the circumstances of such taxation. That the law, in establishing these suits, shall be accepted by both sides as the law of the case, and an adjustment be made in accordance with the principles of law laid down in this decision."

Finding 18 recognizes the fact that, if banks and loan agents did advise and require Indians to pay the personal property tax before they would make a loan to said Indians, accepting as security mortgages upon their lands, all of such banks and loan agents were acting upon their own initiative, and not as officers or agent of defendant county, and that, where persons buying lands of such Indians advised and required payment of personal property tax assessed against the owner of such land, such persons were acting entirely on their own judgment and in their own interest, and not as agents of officers or on behalf of said Dewey county.

These findings of fact, I repeat, are not excepted to and the record clearly sustains such findings. Upon the findings of fact made by the master, a simple outline of which, without going into details, is herewith presented, first the defendant questions the right and the duty of the plaintiff to bring this action for the benefit of these Indians. And here it must be noted that by stipulation of the parties this action is brought, picking out individuals belonging to the different classes, representing 160 different Indians, and involving moneys paid by them to defendant in the sum of more than $10,000.

There is no real question here upon the question of the invalidity of this personal tax.

The findings of the master, the entire record, and the argument of counsel all unite in agreeing that the taxes assessed were upon a class of property that could not be assessed by the county. The record discloses that these assessments were made from time to time, and that the same were carried forward as liens against the allotments of these various Indians, either from year to year, or carried forward when the patent was issued by the government to them, respectively. It is conceded that the fee-simple patent in each case had been issued, delivered, and accepted by the Indian when he paid the tax, all of which was prior to the commencement of this suit by the government for the benefit of which it claims are its Indian wards.

It is the first contention of the defendant that "there are no Indians in South Dakota at the present time who maintain what is generally known as tribal relations," and that the relation of guardian and ward between the government and all of these Indians was terminated by the issuance of the fee-simple patent to their allotments of lands.

By the fifth section of the Allotment Act (Comp. St. § 4201) it is provided that the government shall, at the expiration of the period Indian lands are held in trust, "convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust, and free of all charge or incumbrance whatsoever." United States v. Rickert, 188 U. S. 436, 23 S. Ct. 479, 47 L. Ed. 532.

The question as to the right of the United States to recover these taxes which have been wrongfully collected presents a question for solution, but it is believed to be controlled by what the courts have already determined with reference to the duty the government owes the Indians, and the right of the government to sue in their behalf. "Notwithstanding the condition of wardship of the Indians, it may be conceded that, when an Indian is imposed upon and money wrongfully exacted from him, in general, the United States would have no right of action. But when such exaction is successfully accomplished because of an asserted claim to property expressly held in trust by the United States, as in this case, and the United States, charged with the duty of protecting the property against such claim, has delayed doing so while the exaction has been accomplished, such circumstances furnish the necessary interest in the matter to give the United States the right to ask the undoing of the wrong consummated, because it

was, presumably, busy with other concerns and did not prevent its accomplishment." United States v. Chehalis County (D. C.) 217 F. 284, 285.

[1] In determining the issue presented by this first contention of the defendant, in substance, that there are no Indians in the state of South Dakota, and that the issuance of fee-simple patent to their allotments severs the relations of guardian and ward, we must first determine how this relationship may be terminated, and in that connection it is proper to take into consideration the real status of these Indians, and the attitude maintained by the government toward them as its wards. "From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power." United States v. Rickert, supra, page 436 (23 S. Ct. 480). United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 30 L. Ed. 228. United States v. Nice, 241 U. S. 597, 36 S. Ct. 696, 60 L. Ed. 1192.

In United States v. Rickert, supra, at page 444 (23 S. Ct. 483), the court said: "In view of the relation of the United States to the real and personal property in question, as well as to these dependent Indians still under national control, and in view of the injurious effect of the assessment and taxation complained of upon the plans of the government in reference to the Indians, it is clear that the United States is entitled to maintain this suit. No argument to establish that proposition is necessary."

The relation of the Indians and the government is not one of contract, each party to which is capable of guarding his own interests, but the Indians are in a state of dependency and pupilage, under the care and protection of the government. United States v. Rickert, supra, at page 442 (23 S. Ct. 478).

The recognized relation of the plaintiff and these Indians is that between a superior and inferior, whereby the latter is placed in the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to which they owe care and protection. The parties are not on equal footing, and that inequality is to be made good by the superior justice, which looks only to the substance of the right, without regard to technical rules framed under a

system of municipal jurisprudence formulating the rights and obligations of private persons equally subject to the same laws. Choctaw Nation v. United States, 119 U. S. 1, 28, 7 S. Ct. 75, 30 L. Ed. 306.

[2] Having considered the status of the Indian as the ward of the government, it is proper to next consider how this relationship must be terminated. It is said that the state has conferred upon these Indians the right of suffrage, and other rights that ordinarily belong only to citizens, and that they ought, therefore, to share the burdens of government, like other people who enjoy such rights. These are considerations to be addressed to Congress. It is for the legislative branch of the government to say when these Indians shall cease to be dependent and assume the responsibilities attached to citizenship. This is a political question, which the courts may not determine. We can only deal with the case as it exists under the legislation of Congress. United States v. Rickert, supra, at page 445 (23 S. Ct. 478).

Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one sui juris, the tribal relation may be dissolved and the national guardianship brought to an end; but it rests with Congress to determine when and how this shall be done, and whether that emancipation shall at first be complete or only partial. Citizenship is not incompatible with tribal existence or continued guardianship, and may be conferred without completely emancipating the Indians, or placing them beyond the reach of Congressional regulations adopted for their protection. United States v. Nice, supra, page 598 (36 S. Ct. 696).

When they shall be led out of the state of dependency and pupilage, entitled to the care and protection of the government, is for the United States to determine, without interference by the courts or by any state. The government would not adequately discharge its duty to these people, if it placed its engagements with them upon a basis merely of contract, and failed to exercise any power it possessed to protect them in the possession of such improvements and personal property as were necessary to the enjoyment of the land held in trust for them. In re Rickert, supra.

[3] In the light of the plain determination of the question of the right, the power, and the duty of Congress to terminate this relation of guardian and ward, the Indians named in the complaint must be held to be wards of the government, unless there is legislation of Congress plainly indicating the intent and purpose to terminate the relation. Defend-

ant urges consideration of the Act of January 25, 1910 (36 Stat. 855), relative to determination of the heirs of a deceased Indian, wherein it is provided:

"If the Secretary of the Interior decides the heir or heirs of such decedent competent to manage their own affairs, he shall issue to such heir or heirs a patent in fee for the allotment of such decedent." Section 1.

This, in my judgment, is far short of a congressional declaration that the relationship of guardian and ward shall, by the issuance of the patent, cease. It is simply a step recognizing some progress by the Indian as being competent to handle the particular piece of land, and the act grants to him only the power to manage and dispose of the particular land. There is neither language plainly expressing, nor from which it may be reasonably inferred, that there is any intent or purpose that they should be taken out of the tribe of Indians, that their tribal relations should cease, and they should have no further interest in the tribal lands or in the moneys to be paid for such lands; that they should, from that time forward, not be subject to the agent provided for the band of Indians to which they belong, nor to the rules and regulations promulgated by the Indian Department as to the government of the reservation and all of the Indians thereon, the education of their children, and the policy that the agent is required to work out with and for the members of the tribes.

Attention is also called to what is known as the Burke Act of May 8, 1906, and the provisions of the Act of June 25, 1910. The Burke Act (34 Stat. 182) provides:

"Provided, that the Secretary of the Interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time, to cause to be issued to such allottee a patent in fee simple. * * * That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States. * * * That hereafter when an allotment of land is made to any Indian, and any such Indian dies before the expiration of the trust period, said allotment shall be canceled and the land shall revert to the United States, and the Secretary of the Interior shall ascertain the legal heirs of such Indian, and shall cause to be issued to said heirs and in their names, a patent in fee simple for said land," etc.

It is conceded that this act amends section 6 of the original allotment Act of February 8, 1887, generally known as the Dawes Act, under which these Indians were allotted. The original act provided that the government would hold the land in trust for a period of 25 years, and the Burke Act amended the original Dawes Act, so that, when the Secretary of the Interior deemed an Indian "competent and capable of managing his or her affairs," a fee patent to such allotment could be granted. To my mind, having in view the wide scope of this relation of guardian and ward, this statute falls far short of an expression of an intent and purpose on the part of Congress to sever tribal relations and terminate the relation of guardian and ward by the issuance of this fee-simple patent to the allotment. It evidently was intended to do just what the plain language of the statute expresses, and is a partial release of the Indian from the guardianship to the extent that he may manage and deal with this particular piece of property, independent of such guardianship. To urge more than that is to read into the statute that which does not exist, and which cannot reasonably be implied from the language of the statute or the plain purpose of the legislation.

[4] In the absence of further declaration on the part of Congress that the guardianship of the government shall terminate as to these Indians, it seems clear that it must be so held as to those Indians to whom patents have been issued, who are found by this record to be members of the Cheyenne band of Sioux Indians; that they all had their allotments; that they all resided on their allotments or near them within the original limits of the Cheyenne River reservation, and some of them within the diminished portions thereof; that all of said Indians, at all times mentioned in the complaint, appeared on the rolls at the Cheyenne River agency; that they are entitled to participate and partake of tribal funds and of the rents and profits of all tribal lands, together with the fact that the government maintains an agency and agent in charge of said tribe of Indians, including these particular Indians named in the complaint, are still wards of the government; that the government is still the guardian of all of these Indians, with control of their property, except in so far as that control of their property is released by the legislation above referred to, and the Indians are thereby granted the power to manage and control the particular piece of land involved in the fee-simple patent.

These statutes are so far short of evidencing any intent and purpose that a finding that the Indian is competent to manage this par-

ticular piece of property is a finding that the government has performed its duty and perfected its task undertaken in behalf of these Indians, and that the condition of pupilage and dependency of the particular Indian is discharged, that I can find no reason for predicating such a construction upon any reasonable interpretation of the language used in the statutes. I am therefore of the opinion that these Indians are yet wards of the nation, even though the fee patent has been issued to their allotments; that they are still under a condition of pupilage and dependency, and have not been discharged from that condition; that it is a part of the national policy, by which these Indians are to be maintained as well as prepared for assuming habits of civilization and ultimately the privilege of citizenship, to gradually give to them the right to manage and dispose of certain property, as has been plainly indicated by these statutes with reference to the issuance of fee-simple patents to lands.

The relation the government bears to these Indians is not of a particular person, but of a people; is not of a generation, but of generations; and, while gratifying progress has been made in the development of these dependent people to the ways of civilization, the government has yet to exercise patience and care for years to come, before these dependent people will have developed by education, civilization, and patient effort on the part of those charged with the responsibility, before the government can even consider the possibility of a determination that its duty towards these dependent peoples has been fully performed. This court held, in United States v. Pearson, 231 F. 270, that the Indians on the Cheyenne Indian reservation are still wards of the government and under the protection of the government, and that the civil and political status of the Indian does not condition the power of the government to protect their property or to instruct them and supervise them; that their admission to citizenship does not deprive the United States of its power, nor relieve it of its duty, to control their property and protect their rights from the rapacity and faithlessness of the members of the superior race, to discharge faithfully its legal and moral obligation to them, and to execute every trust with which it is charged for their benefit.

This question was involved in United States v. Chehalis County (D. C.) 217 F. 281. That action was brought to enjoin Chehalis county, in the state of Washington, from enforcing or collecting taxes levied on certain Indian lands, and praying that the clouds upon the title of the allottees be removed; also asking for an accounting of taxes which had been paid by various individual Indians named. The action was commenced by the government before the expiration of the trust period named in the patents. Before the issue was tried, however, that period expired, and the defendant there urged this contention of the defendant in this case, to wit: That the government had lost control of this real estate; that the government was no longer the owner of the real estate of these Indians, and had no interest therein, because it was released by the expiration of the time; and that the guardianship of the Indians was thereby terminated. If that contention had prevailed in that case, it must have resulted in a dismissal of the action and a determination that each of the Indians therein named must proceed in the state courts for the determination of his rights. The action terminated in favor of the government, and the court, at page 284, said:

"If this suit may not proceed to decree, it is apparent that the United States is denied the right to make good its undertaking to these Indians—that the title should be held by it for the Indians for 25 years, not subject to encumbrance or taxation of any character. It is manifest that the only reason to support such a consequence would be because of the delay on the part of the officers of the United States in promptly securing injunctive relief when taxation was first attempted. Statutes of limitation, in the absence of special provision, do not apply to the United States. Laches may, but it is deemed that it would not in such a case as this, where a promise of protection had been made Indian wards and had not been promptly fulfilled. * * * "

And as to the right of the government to maintain an action after the expiration of the trust period, a situation like that that exists here, the court said: "The United States has such an interest in the lands of the Indian allottees, which it has agreed to hold in trust for a stated term free from all liens or taxes, that it may maintain a suit to recover back taxes which were unlawfully imposed on such lands during the term and collected from the allottees."

The power of the United States to maintain suits in its own court to prevent interference with the means it adopts to exercise its powers of government and carry into effect its policies was considered in United States v. Fitzgerald, 201 F. 296, 297, 119 C. C. A. 534 (see also citations). In that case it was said:

"The United States has the power, and for more than a century it has been, and still is, its governmental policy, to protect the Indians and their property from the force, fraud, cunning, and rapacity of the members of the superior race, and to teach them the arts and induce them to adopt the habits of civilization. Indian reservations, allotments of land in severalty with restrictions on alienation held in trust for the Indians, leases thereon on terms prescribed or approved by the Secretary of the Interior, agricultural implements, houses, barns, domestic animals, and other property furnished to the Indians by the United States, or held by the Indians subject to its control and management, are the means by which the United States exercises its power and carries into effect its policy to protect these Indians and their rights of property, and to teach them to abandon nomadic habits and become farmers, laborers, clerks, and business men. The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies. It may maintain such suits, although it has no pecuniary interest in the subject-matter thereof, for the purpose of protecting and enforcing its governmental rights and to aid in the execution of its governmental policies."

The right of the government to maintain an action of this kind was considered in United States v. Fitzgerald, supra, at page 297 (119 C. C. A. 535), wherein it was said:

"The taking by the defendant of the personal property of the Indian Towanta, from him by fraud, without the consent of the Indian agent under whose control, supervision, and management it had been placed for the purpose of protecting it against the fraud and rapacity of members of the defendant's race, was an infringement of the governmental rights of the United States, a hindrance of the execution of its governmental policy, and a wrongful seizure of the lawful means it was using to carry that policy into effect. It was therefore a wrong for the redress of which the United States had the capacity to sue. It may maintain an action for damages for the fraudulent taking of the personal property of an Indian allottee, which is under the supervision, control, and management of the Secretary of the Interior, or his subordinate, an Indian agent, and may hold the amount it recovers in trust for the Indians whose property has been taken or injured, because such suits are lawful aids to redress infringements of its governmental rights, obstructions to the execution of its governmen-

tal policy, and interference with the means it is using to carry that policy into effect."

[5] The familiar doctrine that taxes voluntarily paid cannot be recovered is invoked by the defendant. Placing out of consideration the question whether payment by persons under such disabilities as tribal Indians can correctly be designated as voluntary, and the further question whether such rule is one to be invoked in equity, yet it is clear it has no application here. The exacting requirements necessary to take a given case out of the rule as to voluntary payment grows in part out of the policy of protecting the state from embarrassment in the matter of collecting its revenues. In such manner it does not enter itself in the lists under the same rules by which ordinary litigants must abide. It is hedged about by special privileges in such matter. The disadvantage of the individual in this particular does not obtain in a case such as the present, where the government itself seeks such recovery. To invoke such rule would be to grant immunity to the state—to facilitate the performance of its functions to the detriment of the United States in the discharge of its duties. The reason for the rule has then ceased to exist and therefore the rule is inapplicable. Chehalis Co., supra, 217 F. 285.

[6] The statute of limitation does not operate as against an action maintained by the United States, when the action is brought in public interest. United States v. Am. Bell Tel. Co., 159 U. S. 548, 16 S. Ct. 69, 40 L. Ed. 255.

"It is settled beyond doubt or controversy —upon the foundation of the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided—that the United States, asserting rights vested in them as a sovereign government, are not bound by any statute of limitations, unless Congress has clearly manifested its intention that they should be so bound." United States v. Nashville, C. & St. L. Ry., 118 U. S. 120, 6 S. Ct. 1006, 30 L. Ed. 81.

This doctrine was declared by the court to be applicable with equal force, not only to the question of the statute of limitations in a suit at law, but also to the question of laches in a suit in equity. United States v. Insley, 130 U. S. 263, 9 S. Ct. 485, 32 L. Ed. 968. Stanley v. Schwalby, 147 U. S. 515, 13 S. Ct. 418, 37 L. Ed. 259.

[7] Under the circumstances of the case at bar, the record discloses that the defendant

assessed an illegal tax against these individual Indians, and then took advantage of the statutes of the state authorizing the carrying of a valid tax as a lien upon any real property that might thereafter be acquired by the individual against whom it was assessed, and did carry this illegal tax as a lien, upon the books of the treasurer of the county, against the particular allotments of these individual Indians, after the fee-simple patent had been issued to them, all of which was done for the sole and only purpose of forcing these individual Indians to pay this illegal tax, knowing that the land could neither be sold nor mortgaged, nor in any manner disposed of, without such payments. Because the county succeeded in its unlawful efforts in the collection of this tax, in this manner, it ought not to be heard to say that the tax was voluntarily paid. The moneys were collected from these various Indians by coercive means—by compulsion. The county and its officers could not reasonably have regarded it otherwise. Ward v. Love County, 253 U. S. 24, 40 S. Ct. 419, 64 L. Ed. 751.

As was further said in Ward v. Love County, supra, at page 24 (40 S. Ct. 422): "It is a well-settled rule that 'money got through imposition' may be recovered back; and, as this court has said on several occasions, 'the obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.' * * * To say that the county could collect these unlawful taxes by coercive means and not incur any obligation to pay them back is nothing short of saying that it could take or appropriate the property of these Indian allottees arbitrarily and without due process of law."

I am of the opinion the government may maintain this suit in its capacity as guardian and protector of the estates of these Indian wards, and further that under the findings in this case—to which no exceptions have been taken—it was its duty to do so. It cannot be held the estate of wards of the government may be despoiled and dissipated, as charged in this bill, through fraud, collusion, and combination of the officers of the defendant county, to accomplish such purpose to the use and benefit of the county. United States v. Apple (D. C.) 262 F. 203.

It appears by the stipulation in this case that there are really involved in the determination of the issues the rights of 160 Indians, representing, I assume, that number, or nearly that number, of families of the Indians of this Cheyenne River band of Sioux Indians, and involving the recovery of the payment of more than $10,000, for the benefit of these Indians in proportion to the amount they have paid, respectively. Considering the relation of guardianship sustained by this plaintiff, its right to maintain this suit for an accounting for the benefit of all of these wards should be sustained. To hold otherwise would result in a multiplicity of suits, to avoid which is a ground of equity jurisdiction. United States v. Chehalis, supra, 217 F. 283.

I am therefore of the opinion that the government may maintain this suit in its capacity of guardian and protector of the estates of these Indian wards, and further that under the charges made in the bill in this case, and supported by the findings of fact, it was its duty to do so, for, although it may appear that the Indians themselves each might have maintained a separate action, yet it cannot be held that the estate of these wards of the government may be despoiled and dissipated, fraudulent claims made against them and enforced by the officers of the county under the general laws of the state, and that the government of the United States, the guardian of their interests, is helpless to prevent the same or to obtain redress for their benefit.

It follows that it is my judgment that the findings of fact made by the master, and not excepted to by the defendant, support the conclusions of law made by the master, and therefore that the findings and conclusions should be and are sustained; that judgment shall issue in favor of the plaintiff and against the defendant, requiring an accounting from the defendant for the funds collected from and paid by these Indians, respectively, the same to be paid to the plaintiff, and by plaintiff distributed to the various Indians named in the complaint, in the sum which the record shows they paid, respectively, with interest.