**Thomas IRON CROW, Marie Little Finger and David Black Cat, Plaintiffs,**

v.

**The OGALLALA SIOUX TRIBE OF THE PINE RIDGE RESERVATION, SOUTH DAKOTA, Moses Two Bulls, Charles Little Hawk and Peter Mesteth, Defendants.**

**Civ. No. 456.**

United States District Court, D. South Dakota, W. D.

Feb. 24, 1955.

John C. Farrar, Rapid City, S. D., for plaintiffs.

Richard Schifter, and Arthur Lazarus, Jr., Washington, D. C., Clinton G. Richards, U. S. Atty., Sioux Falls, S. D., H. R. Hanley, Rapid City, S. D., for defendants.

MICKELSON, Chief Judge.

In this case counsel have raised several defenses, which may have merit. However, because of the pendency of several similar cases and the importance of a decision upon the questions involved, I prefer to direct my attention to and decide this case upon the questions hereinafter discussed.

## Part I.

Marie Little Finger and David Black Cat, two of the plaintiffs herein, were tried and convicted in the Ogallala Sioux Tribal Court of the crime of adultery under the provisions of Sec. 61, of the Revised Code of the Ogallala Sioux Tribe. Jurisdiction was exercised under Sections 1 and 1.2 of said Code, they both being enrolled members of the Ogallala Sioux Tribe and the crime having been committed on the Pine Ridge Reservation. The tribal court after reaching a verdict of guilt imposed fines on both defendants and sentenced David Black Cat to thirty days in jail, said jail sentence being suspended on condition of the payment of the fine and good behavior for one year. The fines have not been paid and the tribal authorities intend to proceed with the enforcement of the sentences.

These plaintiffs have brought this suit to enjoin the tribe and its officers from proceeding as intended, alleging that the tribal court did not have jurisdiction to try and convict them of the crime of adultery, and that enforcement of the sentences of the tribal court would deprive said plaintiffs of liberty and property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States. The facts which were the basis for the verdict of guilt in the proceedings before the tribal court and the fairness of the procedures of that tribunal are not disputed or involved in this case. The question presented is whether the Ogallala Sioux Tribal Court is a duly constituted court having jurisdiction to try, convict and punish enrolled members of the Ogallala Sioux Tribe for the crime of adultery committed on the Pine Ridge Reservation.

Defendants maintain that the Ogallala Sioux Tribal Court in law and in fact is a duly constituted judicial tribunal having jurisdiction to try and convict enrolled members of the Ogallala Sioux Tribe for the crime of adultery committed on the Pine Ridge Reservation. They contend that the tribal court derives its authority from two sources, either of which is sufficient to clothe it with the powers it now exercises, the first of these sources being from various federal statutes enacted by Congress pursuant to powers vested in it by the "Indian Commerce Clause" of the United States Constitution. Secondly, that the Ogallala Sioux Tribal Court derives its responsibility for and jurisdiction over the maintenance of law and order among Indians in Indian country as a necessary attribute of original tribal sovereignty, which is recognized in the Constitution of the United States and the various treaties with this tribe of Indians.

Plaintiffs, on the other hand, suggest that the Ogallala Sioux Tribal Court is a recent creation foisted upon members of the tribe through adoption of its Constitution in 1936, and that there is no authority under the Constitution, statutes or treaties for the maintenance of such tribal courts. A review of the historical background of the Ogallala Sioux Tribal Court is both interesting and

helpful in arriving at a decision in this case.

From time immemorial the members of the Ogallala Sioux Tribe have exercised powers of local self-government, regulating domestic problems and conducting foreign affairs, including in later years the negotiation of treaties and agreements with the United States. Report of Commissioner of Indian Affairs, 1881, p. XVIII.

The first step taken by the Department of the Interior to modify the existing tribal system by regulating law and order on the Pine Ridge and other Indian reservations was to create a reservation police force as reported in the Commissioner's Report for the year 1878. By the express terms of Article IX, of the Sioux Agreement of 1877, 19 Stat. 254, and sustained by the Supreme Court in the case of Ex parte Crow Dog, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030, the Ogallala Sioux Tribe and other Sioux Tribes constituting the Sioux Nation agreed to " '* * * loyally endeavor to fulfill all the obligations assumed by them under the treaty of 1868 and the present agreement, and to this end will, whenever requested by the president of the United States, select so many suitable men from each band to co-operate with him in maintaining order and peace on the reservation as the president may deem necessary, who shall receive such compensation for their services as congress may provide.' " 19 Stat. 257, quoted in 109 U.S. 565–566, 3 S.Ct. 402.

In order to carry out the federal government's part of the foregoing agreement Congress in the following year, 1878, and every year since has appropriated federal funds, tribal funds or both, for the maintenance of order and peace on the reservation in accordance with this argeement. See annual Indian Department Appropriation Acts and Reports of the Secretary of the Interior.

No substantial change appears to have been made in the operation of the Indian courts from 1892 until 1936. In 1936 the Department of the Interior promulgated a set of new regulations governing Indian courts. The changes were described in the Report of the Secretary of the Interior for 1936 in the following terms:

"Indian Justice Administration Reorganized.

"Since 1884, reservation Indians have been subjected to arrest, trial, and imprisonment by Indian Service officials and by judges chosen and removable by the superintendent of the reservation. This system has been subject to continued criticism by Indians, by members of Congress, and by Indian welfare societies. Several earlier administrations initiated studies designed to reform the administration of justice on the Indian reservations, but none of these studies resulted in any substantial reforms.

"Under the new law and order regulations, Indian Service officials are prohibited from controlling, obstructing or interfering with the functions of the Indian courts. The appointment and removal of Indian judges on those reservations where courts of Indian offenses are now maintained is made subject to confirmation by the Indians of the reservation. Indian defendants will hereafter have the benefit of formal charges, the power to summon witnesses, the privilege of bail, and the right to trial by jury. The offenses for which punishment may be imposed are specifically enumerated, the maximum of 6 months labor or $360 fine being imposed for such offenses as assault and battery, abduction, embezzlement, fraud, forgery, misbranding and bribery. These offenses are not punishable in any State or Federal court when the offense is committed on reservation land and when only tribal Indians are involved.

"In addition to this criminal jurisdiction, the Indian courts will, in the future, have authority to handle civil cases between tribal Indians.

"The revision of law and order regulations is one step in the program of the present administration to eliminate obsolete regulations and bureaucratic procedures governing the conduct of Indians, and to endow the Indian tribes themselves with increased responsibility and freedom in local self-government."

In line with the policy enunciated in the last paragraph of the above report the Ogallala Sioux Tribe of the Pine Ridge Reservation adopted and the Secretary of the Interior approved on January 15, 1936, a tribal constitution under the provisions of the Indian Reorganization Act, 48 Stat. 987, 25 U.S.C.A. 476, Sec. IV (k) of which authorized the tribal council to assume responsibility for the establishment of a tribal court. In the exercise of its authority under the tribal constitution, the tribal council thereafter enacted a Code of the Ogallala Sioux Tribe which was approved by the Secretary of the Interior on March 20, 1937. A 1952 revision of that code is now in effect.

Under the provisions of the new code the "Pine Ridge Indian Reservation Court" became the "Ogallala Sioux Tribal Court of the Pine Ridge Reservation." Aside from the change in name the only basic difference between the new court and the old one is that the judges of the present court are elected by the Ogallala Sioux Tribal Council while the judges of the old court were appointed by officials of the Bureau of Indian Affairs. Under the new arrangement the federal government and the tribe continued to work in close harmony as indicated by the Secretary's Report for 1938, p. 236; 1942 Report, p. 247; 1943 Report, pp. 284 and 285.

The close cooperation between the federal government and the tribe in law enforcement work is further exemplified by the fact that even after 1937 the operations of the tribal court were financed partly by federal funds. Federal contributions to the Court were continued until 1947 when a sharp cut in appropriations caused the Acting Commissioner of Indian affairs to order a cut in law and order expenditures on the Pine Ridge Reservation. Thereafter the Ogallala Sioux Tribe assumed full responsibility for paying the costs of operating the tribal court. Changes in the code under which it functions continued to be subject to review by the Secretary of the Interior. Constitution of the Ogallala Sioux Tribe, Article IV, Sec. 1, (k).

From this recital of the record it is apparent that the Ogallala Sioux Tribal Court has functioned uninterruptedly for sixty-two years. The record further reveals that throughout this period the tribal court has operated with the full approval and under the regulations of the Department of the Interior, Bureau of Indian Affairs, and its status has been recognized, accepted and endorsed by members of the Ogallala Sioux Tribe.

Plaintiffs in the case at bar concede that the Ogallala Sioux Tribal Court has operated with the approval of the Bureau of Indian Affairs and in accordance with its regulations, but despite its many years of unchallenged existence and its acceptance by the members of the tribe, here question whether Congress has authorized the Bureau's actions in maintaining and recognizing such court. This contention appears to be without merit. The Commissioner's actions in promulgating regulations governing Indian tribal courts was initially authorized by the broad grant of powers contained in 25 U.S.C.A. § 2, R.S. § 463, which provides:

"The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."

That Indian courts are authorized under the above quoted provisions and its companion statutes, was decided sixty-six years ago in U. S. v. Clapox, 9 Cir.,

35 F. 575, 577. The Court in that case said:

> "There is no doubt of the power of the United States to make these rules, nor that the president is authorized by congress to exercise the same."

That case held that the broad grant of authority by Congress to the Commissioner of Indian Affairs and the Secretary of the Interior sufficed to establish the validity of the regulations creating Indian courts. Congress in effect approved, at about the time the decision in the Clapox case was rendered, the creation of Indian courts by the Indian Department Appropriation Act for the year 1889, 25 Stat. 233, which provided "For compensation of judges of Indian courts, at such rate as may be fixed from time to time by the Secretary of the Interior, five thousand dollars, or so much thereof as may be necessary." By the annual appropriation acts since that time Congress has in one form or another appropriated funds for judges of Indian courts or for maintenance of law and order on Indian Reservations.

■ Thus it will be seen that the authority to maintain and regulate tribal courts was originally given the Commissioner in his broad grant of power to "have the management of all Indian affairs". Thereafter, beginning in 1888, Congress ratified his action by appropriating funds for the maintenance of Indian courts. There can be little doubt, therefore, that Congress has actually authorized the establishment and operation of the Ogallala Sioux Tribal Court.

■ The essence of plaintiffs' argument is that the Ogallala Sioux Tribal Court has no jurisdiction to try and convict them for the offense of which they were found guilty and consequently the orders of that tribunal which deprive them of their liberty and property also deprive them of their constitutional rights. However, the opposite of this contention appears to be true. Article I, § 8, Clause 3, authorizes Congress to regulate "Commerce * * * with the In-

dian Tribes". Article II, § 2, authorizes the President by and with the advice and consent of the Senate to make treaties. The foregoing clauses of the Constitution, together with the actions of Congress and the President thereunder reveal the dual nature of the authority of the Indian tribal courts. On the one hand the Constitution has delegated to Congress the right to regulate commerce with the Indian tribes, a power which has been interpreted to be "paramount and of a most sweeping character." People ex rel. Ray v. Martin, 294 N.Y. 61, 60 N.E.2d 541, 545, affirmed 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261. As the Supreme Court declared in Lone Wolf v. Hitchcock, 187 U.S. 553–565, 23 S.Ct. 216, 221, 47 L.Ed. 299,

> "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government."

The Indian Commerce Clause does even more than empower Congress to exercise control over Indian affairs: "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes". It would therefore appear that the Constitution not only acknowledges the authority of the federal government with regard to Indian tribes but also recognizes the existence of Indian tribes as political sovereigns. That the founding fathers regarded Indian tribes as sovereigns is further exemplified by the fact that they dealt with them by treaty, both under the Articles of Confederation, the first one of which was made with the Delaware Nation in 1778, 7 Stat. 13, and under the Constitution, the first such treaty being with the Creek Nation in 1790. 7 Stat. 35.

Judicial acknowledgment of the proposition that the Constitution recognized the continued sovereignty of Indian tribes was first contained in the well known and often quoted opinion of Chief Justice Marshall in Worcester v. Georgia, 1832, 6 Pet. 515, 8 L.Ed. 483. There

Chief Justice Marshall stated inter alia, "The Indian nations had always been considered as distinct, independent, political communities * * *" "* * * and the settled doctrine of the law of nations is that a weaker power does not surrender its independence, its right to self-government, by associating with a stronger and taking its protection." The Court in that case decided that the Cherokee Nation was "a distinct community * * * in which the laws of Georgia can have no force * * *." It observed that entry into the Cherokee Nation could be regulated only by the "Cherokees themselves or in conformity with treaties and with the Acts of Congress." Chief Justice Marshall's words in Worcester v. Georgia have guided our Indian law for the past one hundred and twenty-two years. Following this law the courts have consistently held that Indian tribes have inherent powers of self-government which are recognized by the Constitution, although such powers may be limited, regulated or entirely terminated by Congress at will. Similarly the courts have consistently rejected efforts to have the judiciary interfere with the regulation of Indian affairs by Congress or to impose a rule of law where Congress has failed to act.

Among the questions concerning tribal and federal authority which the Supreme Court has been called upon to decide have been, as in this case, problems concerning the exercise of criminal jurisdiction on Indian reservations. This issue reached the Supreme Court for the first time in Ex parte Crow Dog, 1883, 109 U.S. 556, 3 S.Ct. 396, 404, 27 L.Ed. 1030. The petitioner in the Crow Dog case, a Sioux Indian, had been convicted of the crime of murder in the District Court of the Territory of Dakota, notwithstanding the fact that the offense had been committed against another Sioux Indian within Indian country. The Court first discussed the treaty of 1868 with the Sioux tribes, 15 Stat. 635, and the agreement of 1877, 19 Stat. 254, Article 8 of which provided that " 'congress shall, by appropriate legislation, secure to (the Sioux tribes) an orderly government' ". It then observed:

"The pledge to secure to these people, with whom the United States was contracting as a distinct political body, an orderly government, by appropriate legislation thereafter to be framed and enacted, necessarily implies, having regard to all the circumstances attending the transaction, that among the arts of civilized life, which it was the very purpose of all these arrangements to introduce and naturalize among them, was the highest and best of all,— that of self-government, the regulation by themselves of their own domestic affairs, the maintenance of order and peace among their own members by the administration of their own laws and customs." 109 U.S. at page 568, 3 S.Ct. at page 404.

The Court concluded:

"Offenses * * * by Indians against each other were left to be dealt with by each tribe for itself, according to its local customs. The policy of the government in that respect has been uniform." 109 U.S. at page 571, 572, 3 S.Ct. at page 406.

Following the Crow Dog case Congress decided to exercise its plenary powers in the regulation of Indian affairs by reducing the area of local tribal self-government with regard to law and order. Since 1885 jurisdiction has been vested in the federal courts to try Indians accused of certain crimes even though these crimes were committed against other Indians in Indian country. The crimes over which jurisdiction is now exercised by the federal courts, in accordance with state law, rather than by the tribes themselves, however, are limited to the so-called "ten major crimes", i. e., murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery and larceny. 18 U.S. C.A. § 1153.

The fact that the foregoing withdrawal of tribal jurisdiction as to major

crimes left tribal jurisdiction with respect to other crimes undisturbed was clearly decided in U. S. v. Quiver, 1916, 241 U.S. 602, 36 S.Ct. 699, 700, 60 L.Ed. 1196. That case, too, arose on a Sioux reservation and involved a prosecution for adultery in this very court. In a very well reasoned opinion Justice Van Devanter stated the following:

"At an early period it became the settled policy of Congress to permit the personal and domestic relations of the Indians with each other to be regulated, and offenses by one Indian against the person or property of another Indian to be dealt with, according to their tribal customs and laws. * * * The first change came when, by the act of March 3, 1885 * * * Congress provided for the punishment of murder, manslaughter, rape, assault with intent to kill, assault with a dangerous weapon, arson, burglary, and larceny, when committed by one Indian against the person or property of another Indian. In other respects the policy remained as before. After South Dakota became a state, Congress, acting upon a partial cession of jurisdiction by that State, * * * provided by the act of February 2, 1903, * * * for the punishment of the particular offenses named in the act of 1885 when committed on the Indian reservations in that state, even though committed by others than Indians; but this is without bearing here, for it left the situation with respect of offenses by one Indian against the person or property of another Indian as it was after the act of 1885.

"We have now referred to all the statutes. There is none dealing with bigamy, polygamy, incest, adultery, or fornication, which in terms refers to Indians, these matters always having been left to the tribal customs and laws, and to such preventive and corrective measures as reasonably could be taken by the administrative officers."

Courts have uniformly held that the decisions of Indian tribal courts, rendered within their jurisdiction, territorial and personal, and according to the forms of law recognized by the tribe, are entitled to full faith and credit. Standley v. Roberts, 8 Cir., 59 F. 836. Raymond v. Raymond, 8 Cir., 83 F. 721.

The decision in U. S. v. Quiver, supra, is so clear and unequivocal and the fact situation so similar to the fact situation in the instant case that the Quiver case must necessarily be considered controlling. On the basis of this precedent no conclusion is possible other than that the Ogallala Sioux Tribal Court in the instant case has jurisdiction to try and convict enrolled members of the tribe for the crime of adultery committed on the Pine Ridge Reservation.

Plaintiffs further contend in this case that the granting of citizenship to Indians has in some way changed the previously existing jurisdiction of tribal courts.

Prior to 1924 some Indians or groups of Indians had become citizens of the United States under the terms of treaties or special statute. (Cohen, Handbook of Federal Indian Law, P. 153ff.) In 1924 all remaining non-citizen Indians, born in the United States, including members of the Ogallala Sioux Tribe, were declared to be citizens under the provisions of the Indian Citizenship Act. 43 Stat. 253.

The issue of whether a granting of citizenship in any way has changed the status of Indians in their tribal relations has two facets. First, we may ask, did the granting of citizenship necessarily change the status of Indians under the requirements of the Constitution, and irrespective of the intent of Congress? Second, has their status changed, not because of any requirement of the Constitution, but because Congress so willed it?

The first of these questions was carefully considered by the Supreme Court in U. S. v. Nice, 1916, 241 U.S. 591, 36 S.Ct. 696, 697, 60 L.Ed. 1192, which in-

volved the prosecution of a non-Indian on a charge of having sold intoxicating liquor to an Indian in violation of the federal Indian liquor law. The defense was that the Indian purchaser was a citizen and therefore was no longer covered by the Indian liquor law. Speaking for a unanimous court Justice Van Devanter rejected this contention in the following language:

"Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one sui juris, the tribal relation may be dissolved and the national guardianship brought to an end; but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial. Citizenship is not incompatible with tribal existence or continued guardianship, and so may be conferred without completely emancipating the Indians, or placing them beyond the reach of congressional regulations adopted for their protection. Thus, in United States v. Holliday [3 Wall. 407, 18 L.Ed. 182], a prosecution for selling spiritous liquor to a tribal Indian in Michigan when not on a reservation, the contention that he had become a citizen was dismissed as 'immaterial;' in Hallowell v. United States [221 U.S. 317, 31 S.Ct. 587, 55 L.Ed. 750], a prosecution for taking whisky upon an allotment held by a tribal Indian in Nebraska, the fact that he had been made a citizen was held not to take the case out of the congressional power or regulation; and in United States v. Sandoval [231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107], a prosecution for introducing intoxicating liquors into an Indian pueblo in New Mexico, it was held that whether the Indians of the pueblo were citizens need not be considered, because that would not take from Congress the power to prohibit the introduction of such liquors among them."

To the same effect is Winton v. Amos, 1921, 255 U.S. 373, 41 S.Ct. 342, 349, 65 L.Ed. 684, wherein the Court said:

"It is thoroughly established that Congress has plenary authority over the Indians in all their tribal relations, and full power to legislate concerning their tribal property. The guardianship arises from their condition of tutelage or dependency; and it rests with Congress to determine when the relationship shall cease; the mere grant of rights of citizenship not being sufficient to terminate it."

The decisions of the Supreme Court in U. S. v. Nice and Winton v. Amos, supra, holding that the grant of citizenship to Indians does not alter their continued tribal status are in close harmony with an unbroken line of cases outside of the field of Indian law which declare that aliens have rights equal to citizens under the Fifth and Fourteenth Amendments to the Constitution. See Yick Wo v. Hopkins, 118 U.S. 356, 68 S.Ct. 1064, 30 L.Ed. 220; Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576.

■■ While citizenship bestows upon the individual certain important political rights the foregoing cases clearly hold that under our law, basic constitutional rights, such as asserted by the plaintiffs in this case, are possessed by citizens and resident non-citizens alike, consequently an act which did not violate a Sioux Indian's rights under the due process clause of the Fifth Amendment before he had obtained citizenship also did not violate his constitutional rights after acquisition of citizenship. In the light of this well recognized principle of law the Indian Citizenship Act of 1924 may not be said to affect the continued vitality of the doctrine announced by the Supreme Court in United States v. Quiver, supra. Under the Constitution the grant of citizenship to Indians has not changed their tribal relations or in any manner modified their amena-

bility to the authority of tribes and tribal courts.

The second question posed above is whether Congress in enacting the Indian Citizenship Act intended by legislative fiat to terminate the Indian Tribal Court system. At the same session of Congress when the Indian Citizenship Act was adopted, Congress adopted the Appropriation Act for the Interior Department for the following fiscal year which again appropriated funds for Indian courts. The Citizenship Act was approved by The President on June 2, 1924, and the Appropriation Act, 43 Stat. 396, on June 5, 1924. Further, as has been hereinbefore stated, the Congress had continued to appropriate funds for Indian courts ever since. In 1948 Congress exempted Indians from punishment in certain instances if they had been "punished by the local law of the tribe". 62 Stat. 757, 18 U.S.C.A. § 1152.

On the basis of the foregoing legislative history this court was eminently correct when it declared in U. S. v. Dewey County, 8 Cir., 1926, 14 F.2d 784, 788:

"* * * It is said that the state has conferred upon these Indians the right of suffrage, and other rights that ordinarily belong only to citizens, and that they ought, therefore, to share the burdens of government, like other people who enjoy such rights. These are considerations to be addressed to Congress. It is for the legislative branch of the government to say when these Indians shall cease to be dependent and assume the responsibilities attached to citizenship. This is a political question, which the courts may not determine. We can only deal with the case as it exists under the legislation of Congress. United States v. Rickert, supra, [188 U.S. 432] at page 445. (23 S.Ct. 478 [47 L.Ed. 532] ).

"Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one sui juris, the tribal relation may be dissolved and the national guardianship brought to an end; but it rests with Congress to determine when and how this shall be done, and whether that emancipation shall at first be complete or only partial. Citizenship is not incompatible with tribal existence or continued guardianship, and may be conferred without completely emancipating the Indians, or placing them beyond the reach of Congressional regulations adopted for their protection. United States v. Nice, supra, page 598 (36 S.Ct. 696)."

The decision of this court in the Dewey County case was affirmed by the Circuit Court of Appeals for the Eighth Circuit, 1928, 26 F.2d 434. Certiorari was denied by the Supreme Court, 1928, 278 U.S. 649, 49 S.Ct. 94, 73 L.Ed. 561. This decision has often been cited as one of the leading cases on the question of federal and state jurisdiction in Indian affairs. (Cohen, Handbook of Federal Indian Law, pp. 262, 360 and cases cited.) See also the recent case of U. S. v. Jacobs, D.C.1953, 113 F.Supp. 203. The same conclusion was arrived at, with specific reference to the problem of criminal jurisdiction, in Application of Konaha, 7 Cir., 131 F.2d 737.

In this case plaintiffs are virtually asking this court to break a line of decisions stretching over a period of more than one hundred years. Their request for the termination of tribal criminal jurisdiction is not founded on law but rather on their views of wise governmental policy. Such views should be presented to the legislative branches of our government, rather than to the courts. This issue has been a controversial subject in the halls of Congress. A constitutional amendment to strike the Indian Commerce Clause has been under consideration. S.J. Res 4, 83rd Congress. In addition, only a year ago, Congress adopted legislation which permits the several states to extend their criminal and civil jurisdiction over Indians

on Indian reservations. 67 Stat. 589; 28 U.S.C.A. § 1360 and note; 18 U.S.C.A. § 1162. The President, though signing the measure because of certain other features, criticized that provision under which states, including South Dakota, were given the power to extend their jurisdiction without consulting the Indians affected.

As of today, the forum in which plaintiffs could proceed to change the existing relationship between our Indian people, the State of South Dakota, and the federal government, is the Legislature of the State of South Dakota. The legislature, not the judiciary, is the branch of government having power to affect the changes in the law which plaintiffs urge upon the court in this case.

## Part II.

The third plaintiff in this case, Thomas Iron Crow, is an enrolled member of the Ogallala Sioux Tribe, who possesses allotted land on the Pine Ridge Reservation, the title to which is held by the United States in trust for him. Originally all reservation lands were owned by the Ogallala Sioux Tribe as a unit, but subsequently parcels of land, including that used by Thomas Iron Crow, were allotted to individual members of the tribe under applicable federal law. These separate tracts remained in trust status and still are classified as Indian country.

In past years plaintiff has leased some of his land within the Pine Ridge Reservation for grazing purposes to non-members of the Ogallala Sioux Tribe and he plans to continue this practice in the future. The Ogallala Sioux Tribe has, under the provisions of Tribal Council Resolution 147–50, assessed a tax against plaintiff's lessee for the privilege of grazing stock on land within the reservation, and it, in turn, plans to continue to assess the tax in the future. Plaintiff now brings this action to enjoin the tribe from proceeding with that tax assessment.

The question presented is whether this Indian tribe may levy a tax on non-members of the tribe for the privilege of doing business on reservation land under the tribe's jurisdiction, title to which is held by the United States in trust for an individual member of the tribe.

Under the Sioux Agreement of 1877 the United States promises the Sioux Tribes that "Congress shall, by appropriate legislation, secure to them an orderly government."

The government of the Ogallala Sioux Tribe is organized under the provisions of the Indian Reorganization Act. Under that law Indian tribes are given the right to organize for their common welfare and to adopt appropriate constitutions and by-laws, which were to vest in the tribes certain new powers "in addition to all powers vested in any Indian tribe or tribal council by existing law". 25 U.S.C.A. § 476.

Pursuant to the provisions of the Indian Reorganization Act the Ogallala Sioux Tribe adopted on December 14, 1935, a tribal constitution which was approved by the Secretary of the Interior on January 15, 1936. Article IV, Sec. 1(h) of the constitution authorizes the Ogallala Sioux Tribal Council "to levy taxes upon members of the Ogallala Sioux Tribe and to require the performance of community labor in lieu thereof, and to levy taxes or license fees, subject to review by the Secretary of the Interior, upon non-members doing business within the reservation." In 1947 when Congress reduced the appropriation for the Bureau of Indian Affairs and the Bureau in turn ordered a drastic cut in some of the functions of the Pine Ridge Reservation, including services in the fields of land transactions and of law and order, the tribe assumed responsibility for these public services. Because of the need for additional revenue the Tribal Council in April, 1949, passed Resolution No. 34–49, levying an assessment on leases of trust land by non-members. In April 1950 it was amended, (No. 147–50) to provide that non-members leasing trust land on the Pine Ridge Reservation were to pay an assessment of 3¢ per acre per annum for grazing land, and 15¢ per acre per

annum for farm land. This resolution and the amendment thereto were duly approved by the Indian Bureau Superintendent and submitted to the Secretary of the Interior, who permitted them to go into effect.

It is the plaintiff's contention that the imposition of the tribal tax assessment interferes with his freedom of contract. To a limited extent it may be said that every tax, federal, state, local and tribal, indirectly affects an individual's freedom of contract. The real and only question is whether the Ogallala Sioux Tribe, as a matter of jurisdiction, has the power to levy this tax in accordance with its constitution.

What was said by the Court of Appeals for this circuit in Buster v. Wright, 8 Cir., 135 F. 947, with respect to the tax imposed by the Creek Nation applies with equal force here.

"The payment of this tax is a mere condition of the exercise of this privilege. No noncitizen [of the Creek Nation] is required to exercise the privilege or to pay the tax. He may refrain from the one and he remains free from liability for the other. Thus, without entering upon an extended discussion or consideration of the question whether this charge is technically a license or a tax, the fact appears that it partakes far more of the nature of a license than of an ordinary tax, because it has the optional feature of the former and lacks the compulsory attribute of the latter." 135 F. at page 949.

Judge Sanborn, speaking for the court in that case further said "The authority * * * to prescribe the terms upon which noncitizens may transact business within its borders * * * was one of the inherent and essential attributes of (the Creek Nations) original sovereignty."

It follows, therefore, that plaintiffs' application for an injunction herein is in all things denied and this action is dismissed upon its merits.