# UNITED STATES *v.* NICE.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF SOUTH DAKOTA.

No. 681.   Argued April 24, 1916.—Decided June 12, 1916.

The General Allotment Act of 1887 discloses that the tribal relation
of the Indians, while ultimately to be broken up, was not to be dis-
solved by the making or taking of allotments; and subsequent
legislation shows repeated instances in which the tribal relation
of allottee Indians was recognized as continuing during the trust
period.

Congress has power to regulate or prohibit traffic in intoxicating liquor
with tribal Indians within a State, whether upon or off an Indian
reservation.

When Indians are prepared to exercise the privileges and bear the
burdens of one *sui juris,* tribal relations may be dissolved and the
national guardianship ended, but the time and manner of ending the
guardianship rests with Congress.

Legislation affecting the Indians is to be construed in their interest
and a purpose to make a radical departure is not lightly to be inferred.

Words in a statute, although general, must be read in the light of the
statute as a whole and with due regard to the situation in which they
are to be applied.

Under the General Allotment Act of 1887 and the act of March 2,
1889, making allotments of lands in the Rosebud Reservation,
tribal relations and government wardship were not disturbed by the
allotments or the trust patents; and during the trust period Congress
has power to regulate or prohibit the sale of intoxicating liquor to
Allottee Indians, and so held as to the act of January 30, 1897, c. 109,
29 Stat. 506.

In view of many enactments of Congress since the decision of this
court in *Matter of Heff,* 197 U. S. 488, reflecting the intent of Con-
gress in regard to sale of intoxicating liquor to Indians, this court is
constrained to and does overrule that decision.

THE facts, which involve the construction and con-
stitutionality of the provisions of the act of January 30,

1897, prohibiting the sale of intoxicating liquors to allottee Indians, are stated in the opinion.

*Mr. Assistant Attorney General Warren* for the United States:

The Government contends that the *Pelican Case*, 232 U. S. 214, decided in 1914, is inconsistent with the *Heff Case*, 197 U. S. 488, and must be deemed to overrule it. In the *Pelican Case* it was alleged that murder of an Indian had been committed by a white man in Indian country. Unless the crime took place in Indian country it was not punishable by Federal law, since Congress, though having the power to punish murder of an Indian ward in any locality, had only partially exercised its power, and had confined its legislation to murder in the Indian country. Unless the murder was of an Indian ward of the Government, the crime was not punishable by Federal law, since the state laws extended to crimes committed even in Indian country by a white man (or non-Indian) against another white man (or non-Indian), and Congress had no power to punish such crimes. The murdered Indian was an allottee having the same status as the Indian in the *Heff Case* and in the case at bar. This court held (1) that the allotted land where the murder was committed was Indian country; (2) that the murdered man was an Indian ward under protection of the Government, and that the Federal and not the state law applied to him.

The Government now contends that if an allottee Indian is still capable of protection by Federal law against murder, as a ward, he is capable of protection, as a ward, by Federal law against sale of liquor.

If this court shall hold that the *Pelican* and *Heff Cases* cannot be reconciled, the Government submits that it should reconsider and overrule the *Heff Case*.

It is the contention of the Government in this case that

allottee Indians, even after the Allotment Act of 1887, still remained members of Indian tribes; that the Indian Liquor Act of January 30, 1897, was a valid exercise of the power of Congress under the commerce clause, and not an exercise of police power, and that Congress by the Allotment Act of 1887 did not in fact relinquish, and had no power in law, to relinquish, to the State, its exclusive constitutional regulation of commerce with the Indian tribes and their members.

The power of Congress to regulate commerce with the Indian tribes is exclusive.

Commerce "with the Indian tribes" includes commerce with the individual members of a tribe.

The act of January 30, 1887, is a regulation of commerce with the Indian tribes.

The history of Federal legislation prohibiting sale of liquor to Indians shows that the *Heff Case* was wrong in treating the act of 1897 merely as an exercise of the police power. It was enacted under the commerce clause of the Constitution; and the power to regulate trade with the Indian tribes belongs exclusively to Congress as long as any Indian tribal status exists. The *Heff Case* is inconsistent with *United States* v. *Holliday*.

The tribal relations of the Sioux Indians, in fact, still continue. It has also been shown that the Indian in the case at bar is a member of the Sioux Tribe, and in fact under the care of an Indian agent.

It is for Congress and not for this court to say when the tribal existence shall be deemed to have terminated.

Congress when it terminates tribal status, does so in express terms.

The grant of citizenship does not *ipso facto* terminate tribal status. An Indian allottee, even though a citizen, is still an Indian, and an Indian ward as well.

The General Allotment Act of 1887, conferring citizenship on allottee Indians and subjecting allottees to state

laws, did not abolish tribes nor deprive Congress of power to regulate commerce with tribal allottees.

The act of 1887 did not repeal in express terms Rev. Stat., § 2139, by which statute Congress was exercising its constitutional power to regulate commerce with the Indians; and even if it did so repeal, it could not debar Congress from enacting similar legislation in the future.

Congress has no authority to delegate a power vested by the Constitution in it exclusively.

Even if Congress, by the act of 1887, intended to adopt existing state laws upon the subject of the liquor traffic, and thus by implication to abandon its own regulation (a seemingly untenable implication), nevertheless it retained the power to exercise control over regulation of commerce with the Indian tribes, and this power it exercised by passing the liquor-traffic acts of 1892 and 1897.

Congress, by the act of 1887, clearly did not terminate the tribal relationship or status of the allottee Indians. Hence it had no power irrevocably to commit the regulation of commerce with the Indian tribes into the hands of the States. And when by the act of 1897 it exercised power to regulate, it had the right to do so. Numerous authorities support these contentions.

*Mr. O. D. Olmstead*, with whom *Mr. W. B. Backus* and *Mr. W. J. Hooper* were on the brief, for defendant in error:

The decision of the District Court was based on the construction given to the statute under which the indictment was drawn in *In re Heff*, 197 U. S. 48. The defendant in error stands on the decision in that case, and respectfully contends that this decision correctly construes the statute, and that, thereunder, he is not guilty of an offense.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a prosecution for selling whiskey and other intoxicating liquors to an Indian in violation of the act of January 30, 1897, c. 109, 29 Stat. 506. According to the indictment, the sale was made August 9, 1914, in Tripp County, South Dakota; the Indian was a member of the Sioux tribe, a ward of the United States and under the charge of an Indian agent; and the United States was still holding in trust the title to land which had been allotted to him April 29, 1902. A demurrer was sustained and the indictment dismissed on the ground that the statute, in so far as it purports to embrace such a case, is invalid, because in excess of the power of Congress. The case is here on direct writ of error under the Criminal Appeals Act, March 2, 1907, c. 2564, 34 Stat. 1246.

By the act of 1897 the sale of intoxicating liquor to "any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the Government, or to any Indian a ward of the Government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the Government, through its departments, exercises guardianship," is denounced as a punishable offense.

The allotment to this Indian was made from the tribal lands in the Rosebud Reservation, in South Dakota, under the act of March 2, 1889, c. 405, 25 Stat. 888, the eleventh section (p. 891) of which provided that each allotment should be evidenced by a patent, inaptly so called, declaring that for a period of twenty-five years—and for a further period if the President should so direct—the United States would hold the allotted land in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and at the end of that period would convey the

same to him or his heirs in fee, discharged of the trust and
free of all charge or encumbrance; that any lease or con-
veyance of the land, or contract touching the same, made
during the trust period, should be null and void, and that
each allottee should "be entitled to all the rights and
privileges and be subject to all the provisions" of § 6
of the General Allotment Act of February 8, 1887, c. 119,
24 Stat. 388. The act of 1889 recognized the existence
of the tribe, as such, and plainly disclosed that the tribal
relation, although ultimately to be dissolved, was not to
be terminated by the making or taking of allotments. In
the acts of March 3, 1899, c. 450, 30 Stat. 1362, and
March 2, 1907, c. 2536, 34 Stat. 1230, that relation was
recognized as still continuing, and nothing is found else-
where indicating that it was to terminate short of the
expiration of the trust period.

By the General Allotment Act of 1887 provision was
made for allotting lands in any tribal reservation in
severalty to members of the tribe, for issuing to each al-
lottee a trust patent similar to that just described and
with a like restraint upon alienation, and for conveying
the fee to the allottee or his heirs at the end of the trust
period. Its sixth section, to which particular reference
was made in § 11 of the act of 1889, declared that, upon
the completion of the allotments and the patenting of the
lands, the allottees should have "the benefit of and be
subject to the laws, both civil and criminal, of the State or
Territory" of their residence, and that all Indians born in
the United States who were recipients of allotments under
"this act, or under any law or treaty," should be citizens
of the United States and entitled to all the rights, privi-
leges and immunities of such citizens. This act, like that
of 1889, disclosed that the tribal relation, while ultimately
to be broken up, was not to be dissolved by the making
or taking of allotments, and subsequent legislation shows
repeated instances in which the tribal relation of Indians

having allotments under the act was recognized during the trust period as still continuing.

With this statement of the case, we come to the questions presented for decision, which are these: What was the status of this Indian at the time the whiskey and other liquors are alleged to have been sold to him? And is it within the power of Congress to regulate or prohibit the sale of intoxicating liquor to Indians in his situation?

The power of Congress to regulate or prohibit traffic in intoxicating liquor with tribal Indians within a State, whether upon or off an Indian reservation, is well settled. It has long been exercised and has repeatedly been sustained by this court. Its source is two-fold; first, the clause in the Constitution expressly investing Congress with authority "to regulate commerce . . . with the Indian tribes", and, second, the dependent relation of such tribes to the United States. Of the first it was said in *United States* v. *Holliday*, 3 Wall. 407; 417: "Commerce with the Indian tribes, means commerce with the individuals composing those tribes. . . . (p. 418). The locality of the traffic can have nothing to do with the power. The right to exercise it in reference to any Indian tribe, or any person who is a member of such tribe, is absolute, without reference to the locality of the traffic, or the locality of the tribe, or of a member of the tribe with whom it is carried on. . . . (p. 419). This power residing in Congress, that body is necessarily supreme in its exercise." And of the second it was said in *United States* v. *Kagama*, 118 U. S. 375, 383: "These Indian tribes *are* the wards of the Nation. They are communities *dependent* on the United States. . . . From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power."

What was said in these cases has been repeated and applied
in many others.[1]

Of course, when the Indians are prepared to exercise the
privileges and bear the burdens of one *sui juris,* the tribal
relation may be dissolved and the national guardian-
ship brought to an end, but it rests with Congress to de-
termine when and how this shall be done, and whether
the emancipation shall at first be complete or only partial.
Citizenship is not incompatible with tribal existence or
continued guardianship, and so may be conferred without
completely emancipating the Indians or placing them
beyond the reach of congressional regulatiōns adopted for
their protection.[2]    Thus in *United States* v. *Holliday,* a
prosecution for selling spirituous liquor to a tribal Indian
in Michigan when not on a reservation, the contention
that he had become a citizen was dismissed as "immate-
rial"; in *Hallowell* v. *United States,* a prosecution for taking
whiskey upon an allotment held by a tribal Indian in
Nebraska, the fact that he had been made a citizen was
held not to take the case out of the congressional power
of regulation; and in *United States* v. *Sandoval,* a prose-
cution for introducing intoxicating liquors into an Indian
pueblo in New Mexico, it was held that whether the In-

---

[1] *United States* v. *43 Gallons of Whiskey,* 93 U. S. 188; *Dick* v. *United
States,* 208 U. S. 340; *United States* v. *Sutton,* 215 U. S. 291; *Hallowell*
v. *United States,* 221 U. S. 317; *Ex parte Webb,* 225 U. S. 663; *United
States* v. *Wright,* 229 U. S. 226; *United States* v. *Sandoval,* 231 U. S.
28; *United States* v. *Pelican,* 232 U. S. 442; *Perrin* v. *United States,*
232 U. S. 478; *Johnson* v. *Gearlds,* 234 U. S. 422; *Joplin Mercantile
Co.* v. *United States,* 236 U. S. 531, 545.

[2] *United States* v. *Holliday,* 3 Wall. 407; *Cherokee Nation* v. *Hitch-
cock,* 187 U. S. 294, 308; *United States* v. *Rickert,* 188 U. S. 432, 445;
*United States* v. *Celestine,* 215 U. S. 278; *Tiger* v. *Western Investment
Co.,* 221 U. S. 286, 311–316; *Hallowell* v. *United States,* 221 U. S. 317,
324; *United States* v. *Sandoval,* 231 U. S. 28, 48; *Eells* v. *Ross,* 64 Fed.
Rep. 417; *Farrell* v. *United States,* 110 Fed. Rep. 942; *Mulligan* v.
*United States,* 120 Fed. Rep. 98.

dians of the pueblo were citizens need not be considered, because that would not take from Congress the power to prohibit the introduction of such liquors among them.

The ultimate question then is, whether § 6 of the act of 1887—the section as originally enacted—was intended to dissolve the tribal relation and terminate the national guardianship upon the making of the allotments and the issue of the trust patents, without waiting for the expiration of the trust period. According to a familiar rule, legislation affecting the Indians is to be construed in their interest and a purpose to make a radical departure is not lightly to be inferred. Upon examining the whole act, as must be done, it seems certain that the dissolution of the tribal relation was in contemplation; but that this was not to occur when the allotments were completed and the trust patents issued is made very plain. To illustrate: Section 5 expressly authorizes negotiations with the tribe, either before or after the allotments are completed, for the purchase of so much of the surplus lands "as such tribe shall, from time to time, consent to sell", directs that the purchase money be held in the Treasury "for the sole use of the tribe", and requires that the same, with the interest thereon, "shall be at all times subject to appropriation by Congress for the education and civilization of such tribe . . . or the members thereof." This provision for holding and using these proceeds, like that withholding the title to the allotted lands for twenty-five years and rendering them inalienable during that period, makes strongly against the claim that the national guardianship was to be presently terminated. The two together show that the Government was retaining control of the property of these Indians, and the one relating to the use by Congress of their moneys in their "education and civilization" implies the retention of a control reaching far beyond their property.

As pointing to a different intention, reliance is had

upon the provision that when the allotments are completed and the trust patents issued the allottees "shall have the benefit of and be subject to the laws, both civil and criminal, of the State" of their residence. But what laws was this provision intended to embrace? Was it all the laws of the State, or only such as could be applied to tribal Indians consistently with the Constitution and the legislation of Congress? The words, although general, must be read in the light of the act as a whole and with due regard to the situation in which they were to be applied. That they were to be taken with some implied limitations, and not literally, is obvious. The act made each allottee incapable during the trust period of making any lease or conveyance of the allotted land, or any contract touching the same, and, of course, there was no intention that this should be affected by the laws of the State. The act also disclosed in an unmistakable way that the education and civilization of the allottees and their children were to be under the direction of Congress, and plainly the laws of the State were not to have any bearing upon the execution of any direction Congress might give in this matter. The Constitution invested Congress with power to regulate traffic in intoxicating liquors with the Indian tribes, meaning with the individuals composing them. That was a continuing power of which Congress could not divest itself. It could be exerted at any time and in various forms during the continuance of the tribal relation, and clearly there was no purpose to lay any obstacle in the way of enforcing the existing congressional regulations upon this subject or of adopting and enforcing new ones if deemed advisable.

The act of 1887 came under consideration in *United States* v. *Rickert*, 188 U. S. 432, a case involving the power of the State of South Dakota to tax allottees under that act, according to the laws of the State, upon their allotments, the permanent improvements thereon and the

horses, cattle and other personal property issued to them by the United States and used on their allotments, and this court, after reviewing the provisions of the act and saying, p. 437, "These Indians are yet wards of the Nation, in a condition of pupilage or dependency, and have not been discharged from that condition", held that the State was without power to tax the lands and other property, because the same were being held and used in carrying out a policy of the Government in respect of its dependent wards, and that the United States had such an interest in the controversy as entitled it to maintain a bill to restrain the collection of the taxes.

. In addition to the fact that both acts—the general one of 1887 and the special one of 1889—disclose that the tribal relation and the wardship of the Indians were not to be disturbed by the allotments and trust patents, we find that both Congress and the administrative officers of the Government have proceeded upon that theory. This is shown in a long series of appropriation and other acts and in the annual reports of the Indian Office.

As, therefore, these allottees remain tribal Indians and under national guardianship, the power of Congress to regulate or prohibit the sale of intoxicating liquor to them, as is done by the act of 1897, is not debatable.

We recognize that a different construction was placed upon § 6 of the act of 1887 in *Matter of Heff*, 197 U. S. 488, but after reëxamining the question in the light of other provisions in the act and of many later enactments clearly reflecting what was intended by. Congress, we are constrained to hold that the decision in that case is not well grounded, and it is accordingly overruled.

*Judgment reversed.*