The **UNITED STATES** of America, Plaintiff,

v.

**9,345.53 ACRES OF LAND, MORE OR LESS, Situate IN CATTARAUGUS COUNTY, NEW YORK, et al., Defendants.**

Civ. Nos. 10432–10435, 10532, 10508, 10496, 10562, 10616, 10635, 10662, 10668, 10699, 10726, 10751, 10768, 10769, 10764, 10779, 10783, 10789, 10782, 10784, 10780, 10794, 10793, 10792, 10790, 10791.

United States District Court
W. D. New York.
July 22, 1966.

John T. Curtin, U. S. Atty., for plaintiff.

Lansdowne, Horning & Elfvin, Buffalo, N. Y. (John T. Elfvin, Buffalo, N. Y., of counsel), for defendants.

HENDERSON, District Judge.

Claiming that five oil and gas leases on lands in the Allegany Indian Reservation are invalid, the Government seeks judgment against the Devonian Gas and Oil Company, J. Cordell Moore, C. Walter Harris, Tom Black, A. W. Robertson, M. L. McCullough, Christopher W. Hurley and Frederick J. Meyer, as alleged holders and owners of interests or rights under the leases. Entered into on December 1, 1955, the leases cover some 18,000 acres of land, half of which will be subject to flooding. Neither the leases nor the assignment of the leases involved were approved by state or federal authorities.

In entering into the leases the Seneca Nation was represented by an attorney who met with the Nation's Council and advised concerning the lease rights. The

Government does not contend that the leases are other than fair and just, that there was overreaching on the part of the lessees, or that there has been any default by the lessees or their assignees. However, the Government claims that in the absence of compliance with the provisions of the Federal Act of May 11, 1938 (52 Stat. 347, 25 U.S.C. §§ 396a, 396b, 396c and 396d), the leases are void.

Should those provisions be applicable to the leases in question, there appears to be no doubt as to the correctness of the Government's claim. See Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912); Smith v. McCullough, 270 U.S. 456, 46 S.Ct. 338, 70 L.Ed. 682 (1926); Stoltz v. United States, 99 F.2d 283 (9th Cir. 1938); American Surety Co. of New York v. United States, 112 F.2d 903 (10th Cir. 1940).

The statutes provide that "unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction * * * may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council * * * for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities,"[1] that "[l]eases for oil and/or gas-mining purposes * * * shall be offered for sale to the highest responsible qualified bidder, at public auction or on sealed bids,"[2] that lessees "* * * shall furnish * * * bonds, in amounts satisfactory to the Secretary of the Interior * * *"[3] and, additionally, that all such leases shall be subject to "* * * the rules and regulations promulgated by the Secretary of the Interior."[4] Such regulations have been promulgated[5] and, among other things, provide for an acreage limitation,[6] a re-

striction on assignment[7] and for the manner of cancellation.[8]

■ Obviously, the United States, acting to safeguard the Indians in the conduct of their affairs, has established a comprehensive statutory and regulatory scheme covering mineral leasings on tribal lands. Such action, of course, is consistent with the historical relationship of guardian and ward existing between the United States and Indian tribes. See United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); Tiger v. Western Inv. Co., 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738 (1911); United States v. Waller, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843 (1917); United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916); Brader v. James, 246 U.S. 88, 38 S.Ct. 285, 62 L.Ed. 591 (1918); Sunderland v. United States, 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259 (1924); Board of Comm'rs of Creek County v. Seber, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943).

To avoid the effect of non-compliance with the federal statutes and regulations, the defendants rely upon sections 5 and 7 of a 1950 act entitled "An Act To regulate the collection and disbursement of moneys realized from leases made by the Seneca Nation of Indians of New York, and for other purposes" (64 Stat. 442). Those sections provide:

"Sec. 5. In addition to the authority now conferred by law on the Seneca Nation of Indians to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of the Act of February 19, 1875 (18 Stat. 330), the Seneca Nation of Indians, through its council, is authorized to lease lands within the Cattaraugus, Allegany, and Oil Springs

1. 25 U.S.C. § 396a.

2. 25 U.S.C. § 396b.

3. 25 U.S.C. § 396c.

4. 25 U.S.C. § 396d.

5. 25 C.F.R. 171–171.30.

6. 25 C.F.R. 171.9.

7. 25 C.F.R. 171.26.

8. 25 C.F.R. 171.27.

Reservations, outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York.

\* \* \* \* \*

"Sec. 7. All Acts or parts of Acts inconsistent with this Act are hereby repealed."

The defendants claim that this act completely withdrew federal supervision over mineral leasings by the Seneca Nation and, in the absence of applicable state laws, lodged unguarded control over mineral leasings in the Nation.

While the 1950 act clearly was intended to withdraw the United States from certain activities involving the collection and disbursement of leasing funds and thereby permit the closing of the local Indian agency, ascertainment of the intentions of Congress in enacting sections 5 and 7 requires more than a surface reading. Initially, reference to the history of those earlier acts, which section 5 supplements, is helpful.

Prior to 1875 non-Indian settlers leased reservation lands from the Seneca Indians without the approval of the United States. Such leases, purportedly ratified by the State of New York, were invalidated by an unreported decision of the New York Supreme Court.[9] Consequently, the Act of February 19, 1875 (18 Stat. 330) was passed. That act ratified existing leases of lands within the Cattaraugus and Allegany Reservations to railroad corporations and authorized the Seneca Nation, in accordance with its laws, to lease lands for railroad purposes. In addition, the act ratified existing leases of lands within specified villages (the boundaries of which were to be established under the provisions of the act) for a period not to exceed five years. Thereafter, the Nation was authorized to renew leases within the villages for periods not to exceed twelve years.

The Act of September 30, 1890 (26 Stat. 558) merely extended the authorized period for leasings within the villages from twelve to ninety-nine years.

In its initial bill form (H.R. 4942) the 1950 act referred to the previous authority of the Nation to lease lands to the railroads and to lease lands within the limits of villages established under the authority of the Act of February 19, 1875, and conferred additional authority to lease lands within the Cattaraugus, Allegany and Oil Springs Reservations "outside the limits of such villages." It failed to specify the purposes for which such leases might be made and limited the period of such leases to ten years.

With the aforementioned history, it would appear that the bill, as initially proposed, could be viewed as merely authorizing leasings, outside villages, similar to those with which the Nation had had experience under the 1875 and 1890 acts. Such leasings, of course, would have been limited to surface leasings, and there was no indication that mineral leasings, governed by the aforedescribed statutes and regulations, in any way were involved.

However, following the report and recommendations of Under Secretary of the Interior Oscar L. Chapman, and based upon his observations that " \* \* \* the bill does not specify the purposes for which leases may be made and limits the period of any lease to not exceeding 10 years" which "may be too short particularly as to mineral and other leasings requiring extensive development," the bill was amended to include leases "for such purposes and such periods as may be permitted by the laws of the State of New York."[10] Thus, with the adoption of that amendment, mineral leases clearly came within the terms of section 5 of the 1950 act.

---

9. That decision is set out in H.R.Misc. Doc. No. 75, 43rd Cong., 2d Sess., 1875.

10. The report of Under Secretary Chapman is set out in H.R.Rep. No. 1238, 81st Cong., 1st Sess. 2–3 (1949) and S.Rep. No. 2105, 81st Cong., 2d Sess. 6–7 (1950), U.S.Code Cong.Serv.1950, p. 2978.

Congress' attention clearly appears to have been focused on that aspect of the bill dealing with the collection and disbursement of funds realized from leases. It should be noted that it was then considering the proposed surrender of federal control, under proper safeguards and in association with enacted state law,[11] to state and local authorities and the Seneca Nation. In that frame of reference, section 5, as amended, was passed. As some indication that the result urged by defendants was not intended, the court also is impressed with the concern reflected, throughout the legislative history of the 1950 act, for safeguarding the Indians' welfare. For example, Representative Reed's assurance, following an inquiry by Representative Burdick, that under the bill "everything is under bond" and that "the Treasurer is under bond approved by the Comptroller of the State of New York."[12] Such concern over the safeguards contained in one aspect of the bill hardly comports with removal without mention of the more substantial safeguards contained in sections 396a, 396b, 396c, and 396d, under sections 5 and 7 of the bill.

Legislation affecting the Indians is to be construed in their interest, a purpose to make a radical departure from the traditional relationship of guardian and ward is not lightly to be inferred, and the courts reasonably may insist that the purpose of Congress to make such a departure be clearly indicated. See United States v. Celestine, 215 U.S. 278, 290–291, 30 S.Ct. 93, 54 L. Ed. 195 (1909); United States v. Nice, 241 U.S. 591, 599, 36 S.Ct. 696 (1916). Certainly, a construction that the safeguards contained in sections 396a, 396b, 396c, and 396d, had been removed without mention and that, in the absence of a framework of law adopted by the State of New York and specifically addressed to the welfare of the Seneca

Nation, the Nation had been cast adrift under the general leasing laws of the State of New York, must be viewed as drastic and unwarranted in light of both the terms of the act and the relationship that had existed between the Government and the Seneca Nation prior to 1950.

Having considered the language employed in the 1950 act, its history, the then existing relationship between the Government and the Nation, as well as the state of development of the Nation, the court concludes that the defendants' construction of sections 5 and 7 cannot be sustained. In the court's view, section 5 was not intended as a withdrawal of the Nation's existing right to lease lands in accordance with the provisions of sections 396a, 396b, 396c, and 396d, but as a grant of a new and additional right to the Nation to lease reservation lands "for such purposes and such periods as *may be* permitted by the laws of the State of New York." [Emphasis added.] Section 5, in substance, recognized the contributions of the State of New York to the welfare of the Seneca Nation [13] and, accordingly, granted to the Nation the right to lease its lands under such laws as the State of New York might deem to be in the Nation's best interest. Section 7, on the other hand, obviously refers to repeal of inconsistent provisions in the earlier Seneca leasing acts of February 19, 1875 (18 Stat. 330) and September 30, 1890 (26 Stat. 558) and did not operate to repeal the provisions of 396a, 396b, 396c, and 396d, which are entirely consistent with the court's interpretation of section 5.

It follows that in the presence of New York law forbidding or, in the absence of specific New York law authorizing, leasings by the Seneca Nation, the Nation was required to exercise its rights in accordance with federal law. The leases in question, entered into in violation of the provisions of sections 396a,

11. 787 N.Y.Sess.Laws of 1949, set out in S.Rep. No. 2105, 81st Cong., 2d Sess. 3–4 (1950).

12. 96 Cong.Rec. 6092 (1950).
13. 96 Cong.Rec. 6091–6092 (1950) (remarks of Representative Reed).

396b, 396c, and 396d, and not pursuant to enabling laws of the State of New York, are void.

Submit judgment on five (5) days' notice.