RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0151P (6th Cir.)
File Name: 04a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GRAND TRAVERSE BAND OF
OTTAWA AND CHIPPEWA
INDIANS,
     *Plaintiff-Appellee,*

     *v.*

OFFICE OF THE U.S.
ATTORNEY FOR THE WESTERN
DISTRICT OF MICHIGAN,
     *Defendant,*

STATE OF MICHIGAN,
     *Intervenor-Appellant.*

No. 02-1679

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 96-00466—Douglas W. Hillman, District Judge.

Argued: March 10, 2004

Decided and Filed: May 24, 2004

---

Before: MARTIN and CLAY, Circuit Judges; MILLS,
District Judge.[*]

---

**COUNSEL**

**ARGUED:** John M. Charamella, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Riyaz A. Kanji, KANJI & KATZEN, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** John M. Charamella, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Riyaz A. Kanji, Phillip F. Katzen, KANJI & KATZEN, Ann Arbor, Michigan, John F. Petoskey, GRAND TRAVERSE BAND LEGAL DEPARTMENT, Peshawbestown, Michigan, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge. The State of Michigan, the intervenor in this litigation, appeals the April 22, 2002, order of the district court, declaring that it is permissible for the Grand Traverse Band of Ottawa and Chippewa Indians ("the Band") to conduct casino-style gaming at a site which is located off of the Band's initial reservation and which was acquired and placed in trust for the Band after the enactment of the Indian Gaming Regulatory Act, 25 U.S.C. § 2710 *et seq.* ("IGRA"), pursuant to an exception for such gaming on lands taken into trust as part of the restoration of lands for an Indian tribe that is restored to federal recognition, 25 U.S.C.

---

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

§ 2719(b)(1)(B)(iii).    For the reasons that follow, we
**AFFIRM** the well-reasoned decision of the district court.

## I

### A.  Substantive Facts[1]

The Band is a federally recognized Indian tribe presently
maintaining a government-to-government relationship with
the United States.  The Band previously maintained a
government-to-government relationship with the United
States from 1795 until 1872, and is a successor to a series of
treaties with the United States in 1795, 1815, 1836 and 1855.
In 1872, then-Secretary of the Interior, Columbus Delano,
improperly severed the government-to-government
relationship between the Band and the United States, ceasing
to treat the Band as a federally recognized tribe.  This
occurred because the Secretary had misread the 1855 Treaty
of Detroit, 10 Stat. 591.[2]    Following termination of the

---

[1] The following description is taken from the district court's
memorandum opinion in *Grand Traverse Band of Ottawa & Chippewa
Indians v. Office of the U.S. Attorney of the W. Dist. of Mich.,* 198 F.
Supp. 2d 920, 924-26 (W.D. Mich. 2002) ("*Grand Traverse Band II*").
The relevant facts in this case are undisputed.

[2] Henry Schoolcraft, who negotiated the 1836 Treaty of Washington
on behalf of the United States, combined the Ottawa and Chippewa
nations into a joint political unit solely for purposes of facilitating the
negotiation of that treaty.  In the years that followed, the Ottawas and
Chippewas vociferously complained about being joined together as a
single political unit.  To address their complaints, the 1855 Treaty of
Detroit contained language dissolving the artificial joinder of the two
tribes.  This language, however, was not intended to terminate federal
recognition of either tribe, but to permit the United States to deal with the
Ottawas and the Chippewas as separate political entities.  Ignoring the
historical context of the treaty language, Secretary Delano interpreted the
1855 treaty as providing for the dissolution of the tribes once the annuity
payments it called for were completed in the spring of 1872, and hence
decreed that upon finalization of those payments "tribal relations will be

---

relationship, the Band experienced increasing poverty, loss of
land base and depletion of the resources of its community.

Between 1872 and 1980, the Band continually sought to
regain its status as a federally recognized tribe.  The Band's
efforts succeeded in 1980 when it became the first tribe
"acknowledged" by the Secretary of the Interior pursuant to
the federal acknowledgment process, 25 C.F.R. Part 54 (now
25 C.F.R. Part 83).  On January 17, 1984, the Department of
the Interior declared a single 12.5 acre parcel as the initial
reservation of the Band. 49 Fed. Reg. 2025 (Jan. 17, 1984).
The history of the Band's original recognition, executive
termination and later re-recognition is essentially parallel to
that of the Pokagon Band of Potawatomi Indians, the Little
Traverse Bay Bands of Odawa Indians, and the Little River
Band of Ottawa Indians. All three tribes were parties to the
same series of treaties and the same termination by Secretary
Delano in 1872.

On April 20, 1989, the Band acquired title to a parcel of
land in Whitewater Township, Grand Traverse County,
Michigan, that is commonly referred to as the "Turtle Creek"
site.  Located on the east shore of Grand Traverse Bay, Turtle
Creek is at the heart of the region that comprised the core of
the Band's aboriginal territory and was historically important
to the economy and culture of the Band.  Acquisition of the
Turtle Creek site was important for the Band to maintain a
connection to the east shore region and to provide services
and economic development to its members located on the east
shore. Although the Turtle Creek site is not located within or
contiguous to the Band's last recognized reservation, it is

---

terminated." *Letter from Secretary of the Interior Delano to Commission
of Indian Affairs* at 3 (Mar. 27, 1872).  Beginning in that year, the
Department of the Interior, believing that the federal government no
longer had any trust obligations to the tribes, ceased to recognize the
tribes either jointly or separately.

within the lands that the Band ceded to the United States by the Treaty of 1836. The trust application for the Turtle Creek site did not indicate that it was being acquired for gaming purposes, though it did specify that it may be used for future economic development. The site was placed into federal trust on August 8, 1989.

In August 1993, the Band entered into a tribal-state gaming compact with the State of Michigan pursuant to the IGRA, 25 U.S.C. § 2710, for Class III (casino-style) gaming on reservation lands. The compact is virtually identical to those signed between the State and six other Indian tribes on the same day. The United States Department of the Interior approved the compact under the IGRA's procedures. The Michigan House of Representatives and the Michigan Senate approved the compacts by concurrent resolution on September 21, 1993 and September 30, 1993, respectively. The compacts became effective on November 30, 1993, when the Secretary of the Interior published his approval of the compacts in the Federal Register. 58 Fed. Reg. 63,262 (1993).

On June 13, 1994, the National Indian Gaming Commission approved the Band's Gaming Code pursuant to 25 C.F.R. §§ 522.6 and 522.8. In accordance with the Band's Gaming Code, the Grand Traverse Band Gaming Commission issued a license authorizing casino-style gaming at the Turtle Creek site. The Band opened its Turtle Creek Casino on June 14, 1996. The casino's operations now employ hundreds of tribal members and fund hundreds of tribal government positions responsible for administering programs such as health care, elder care, child care, youth services, education, housing, economic development and law enforcement.

## B. Procedural History

On June 14, 1996, the day the Band commenced casino operations at Turtle Creek, it brought a declaratory judgment

action against the U.S. Attorney for the Western District of Michigan. The complaint sought a declaration concerning the legality of the Class III (casino-style) gaming being conducted at Turtle Creek. The United States filed a counterclaim, seeking to declare the Turtle Creek facility illegal and to enjoin further gaming at the facility. The State of Michigan was permitted to intervene as a defendant and to file a complaint seeking to declare the operations illegal under the tribal-state compact.

The State contended that the Turtle Creek casino operation is illegal because the IGRA, 25 U.S.C. § 2719, bars casino gaming on tribal lands taken into trust after October 17, 1988 (which is the case with Turtle Creek), unless the land meets one of the exceptions set forth in § 2719. The State argued that Turtle Creek does not meet any of the § 2719 exceptions, and, consequently, casino-style gaming is unlawful, absent a determination by the Secretary of the Interior and the consent of the Governor of Michigan, that the casino would be in the best interests of the tribe and its members and would not be detrimental to the surrounding community. The Band has not sought such a determination from the Secretary, nor the consent of the Governor, insisting that the Turtle Creek location satisfies one of the § 2719 exceptions.

The Band's original complaint asserted that the gaming prohibition contained in 25 U.S.C. § 2719 does not apply when a Tribe has a valid tribal-state compact. Following the decision of this Court in *Keweenaw Bay Indian Community v. United States,* 136 F.3d 469 (6th Cir. 1998), the Band abandoned this claim, amended its complaint, and asserted that the Turtle Creek site is "within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988," pursuant to § 2719(a)(1), and thus was exempted from the prohibition against casino-style gaming. The United States then moved for a preliminary injunction against continued gaming operations at Turtle Creek. In response, the Band proffered additional theories to support its exemption

from the prohibition: (1) the Turtle Creek land is exempt because it had been taken into trust as part of "the initial reservation of an Indian tribe acknowledged by the Secretary" of Interior, pursuant to § 2719(b)(1)(B)(ii) and (2) the land is exempt because it constituted part of "the restoration of lands for an Indian tribe that is restored to Federal recognition" pursuant to § 2719(b)(1)(B)(iii).

On March 18, 1999, the district court denied the United States' motion in a published opinion. *See Grand Traverse Band of Ottawa & Chippewa Indians v. United States Attorney for the W. Dist. of Mich.,* 46 F. Supp.2d 689 (W.D. Mich. 1999) ("*Grand Traverse Band I*"). The district court held that the government had not demonstrated a substantial likelihood of success in proving that the Turtle Creek land does not satisfy the "restoration of lands" exemption, 25 U.S.C. § 2719(b)(1)(B)(iii). *Id.* at 702-04. The district court further stayed the litigation, pending a reference of the matter to the National Indian Gaming Commission ("NIGC"). *Id.* at 706. The court found that it could benefit from the NIGC's determination of both factual and legal issues relating to the application of the "restoration of lands" exception. *Id.* at 707-08. The State appealed the district court's denial of the preliminary injunction, but this Court dismissed the appeal because the State, as an intervenor, had not joined with the United States' motion for preliminary injunction, and therefore lacked standing to pursue the appeal. *See Grand Traverse Band of Ottawa & Chippewa Indians v. Office of the U.S. Attorney for the W. Dist. of Mich.,* No. 99-1584 (6th Cir. May 17, 2001).

On August 31, 2001, Kevin Washburn, General Counsel for the NIGC, sent the district court a 19-page letter regarding whether the Turtle Creek site is exempt from the prohibition against casino-style gaming for lands acquired after the effective date of the IGRA. The NIGC found that the Turtle Creek site is exempt from the prohibition pursuant to the exception for lands that are taken into trust as part of "the

restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). To reach this conclusion, the NIGC answered two questions: (1) whether the Band became an Indian tribe that "is restored to Federal Recognition" when the Secretary of the Interior invoked an administrative process to formally "acknowledge" the tribe in 1980; and (2) whether the Turtle Creek lands were taken into trust as part of the restoration of lands for the Band. In answering both questions in the affirmative, the NIGC reasoned as follows:

The Band had a government-to-government relationship with the United States until 1876 at which time BIA officers improperly terminated the federal trust relationship by administrative action. The clear import of acknowledgment of the [Band] under federal acknowledgment procedures was to "undo" the effect of the improper administrative action and to resume a proper government-to-government relationship between [the Band] and the federal government. The result was "restoration" under the plain meaning of that term. Accordingly, it is difficult to argue that the [Band] is not a "restored tribe" if the term should be interpreted according to its plain meaning. …The Band has assembled substantial evidence tending to establish that the Turtle Creek site has been important to the tribe throughout its history and remained so immediately on resumption of federal recognition.…The site is within the area ceded to the United States by the ancestors of the present [Band].…The region surrounding the casino site also has a modern nexus to the tribe. It is located within the "service area" for which tribal members are entitled to receive services by the BIA.…At the time of termination, Band members lived not far from the Turtle Creek site. For most of the Band's recorded history, it has lived and worked in this general area.…In light of this showing of continuous interest in the area, the Band has regained beneficial title to land that it may have

ceded but did not abandon. In regaining its beneficial use (the fee being held by the United States) to land that has been at the heart of the Band's culture throughout history and particularly within the context of its restoration process, the [NIGC] believes that the Turtle Creek site constitutes land that has been not merely obtained but, in some sense, "restored' to the Band under Section 2719(b)(1)(B)(iii).

(J.A. 222-31.) The Department of the Interior subsequently concurred with the NIGC's opinion.

As a consequence of this administrative opinion, the United States abandoned its opposition to the Turtle Creek casino and withdrew from the litigation. The district court then permitted the Band to amend its complaint for a second time, to reflect that the only issues that remained for trial were whether the Turtle Creek site satisfied the "restoration of lands exception" and whether the tribal-state compact afforded the Governor of Michigan with an absolute veto power over the siting of a casino at Turtle Creek.

A bench trial was held in January, 2002. On April 22, 2002, the district court issued a memorandum opinion and order in which it held that the Turtle Creek site was subject to the "restoration of lands" exception. *Grand Traverse II, supra.* The court noted, and the parties agreed, that the NIGC's finding that the "restoration of lands" exception applied to the Turtle Creek site was not entitled to the highest level of deference accorded to an administrative agency because the NIGC had not employed formal adjudicatory procedures. *Grand Traverse Band II,* 198 F. Supp. 2d at 927 (holding that NIGC opinion was not entitled to deference per *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)). Nevertheless, the court gave such deference to the NIGC opinion as it deemed appropriate "in light of the thoroughness, reasoning and consistency of its determination." *Id.* at 928 (citing *United States v. Mead*

*Corp.,* 533 U.S. 218, 228-30, 233-35)). The court deemed it appropriate to afford the NIGC opinion "substantial weight" and found no reasonable basis for altering its conclusion that the Band is a restored tribe within the meaning of the IGRA. *Id.*

The court then independently examined whether the Turtle Creek site is exempt from the prohibition pursuant to the exception for lands that are taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition" under 25 U.S.C. § 2719(b)(1)(B)(iii). As the NIGC had done, the court broke this question into two parts: first, whether the Band is a "restored tribe" and second, whether the acquisition of Turtle Creek is part of a "restoration of lands."

The court found that the words "restored" and "restoration" in the statutory exception were not defined in the IGRA, and therefore it looked to the plain meaning of the words. *Grand Traverse Band II,* 198 F. Supp.2d at 928. The court noted that the dictionary definition of "restore" includes the following meanings: to give back (as something lost or taken away), make restitution of, return, to put or bring back (as into existence or use); and to bring back or put back into a former or original state. *Id.* (citing Webster's New Third New Int'l Dictionary 1936 (1976)). The court also looked to the dictionary definition of "restoration," which includes the following meanings: an act of restoring or the condition or fact of being restored: as bringing back to or putting back in to a former position or conditions, reinstatement, renewal, or reestablishment. *Id.* (citing Webster's at 1936). The court then held that the Band clearly was a "restored tribe" under a plain meaning interpretation:

[T]he undisputed history of the Band's treaties with the United States and its prior relationship to the Secretary and the BIA demonstrates that the Band was recognized and treated with by the United States. Both prior to and

after such treaties, until 1872, the Band was dealt with by the Secretary as a recognized tribe. Only in 1872 was that relationship administratively terminated by the BIA. This history–of recognition by Congress through treaties (and historical administration by the Secretary), subsequent withdrawal of recognition, and yet later re-acknowledgment by the Secretary–fits squarely within the dictionary definitions of "restore" and is reasonably construed as a process of restoration of tribal recognition. The plain language of subsection (b)(1)(B)(iii) therefore suggests that this Band is restored.

*Id.* at 934.

Having found in favor of the Band on the first question (whether the Band was a tribe restored to federal recognition), the district court proceeded to address the second question (whether the Turtle Creek site was acquired as part of a "restoration of lands"). The court ruled in favor of the Band on this question as well. *Id.* at 936. The court further rejected the State's assertion that casino-style gaming is barred by section 2(C) of the tribal-State compact, which allegedly gives the Governor of Michigan absolute veto power over gaming activities on lands taken into trust for the Band. *Id.* at 937. The court held that the plain language of the compact merely incorporated by reference the Governor's concurrence power "pursuant to 25 U.S.C. § 2719," and therefore the Governor had no greater veto power than that vested by § 2719. *Id.* at 938.

Based on the foregoing, the district court concluded that casino-style gaming is permissible at the Turtle Creek site pursuant to 25 U.S.C. § 2719(b)(1)(B)(iii) (the "restoration of lands" exception). The court entered judgment in favor of the Band on April 22, 2002. *Id.* at 940. The State filed a timely appeal.

## II

In this appeal, the State has not contested the district court's ruling that the acquisition of Turtle Creek was part of a "restoration of lands." Accordingly, the sole issue for this Court is whether the Band is a tribe "restored to federal recognition."[3] Like the district court below, we answer this question in the affirmative.

Section 20 of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719, generally prohibits casino-style gaming on lands acquired by the Secretary of the Interior in trust for an Indian tribe after October 17, 1988, unless an exception is satisfied. That section states, in relevant part:

(a) Prohibition on lands acquired in trust by Secretary

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless--

   **(1)** such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988; or

   **(2)** the Indian tribe has no reservation on October 17, 1988, and–

* * * *

   **(B)** such lands are located in a State other than Oklahoma and are within the Indian tribe's last

---

[3]There are no disputed issues of fact on appeal, only issues of statutory interpretation, which this court reviews under a *de novo* standard. *United States v. Miami Univ.,* 294 F.3d 797, 806 (6th Cir. 2002).

recognized reservation within the State or States within which such Indian tribe is presently located.

(b) Exceptions

**(1)** Subsection (a) of this section will not apply when--

**(A)** the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

**(B)** lands are taken into trust as part of--

**(i)** a settlement of a land claim,

**(ii)** the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

**(iii)** the restoration of lands for an Indian tribe that is restored to Federal recognition.

25 U.S.C.A. § 2719.

The IGRA does not define the words "restored" and "restoration" in the "restoration of lands" exception set forth at § 2719(b)(1)(B)(iii). Therefore, this Court must give the words "their ordinary, contemporary, common meaning,

absent an indication Congress intended them to bear some different import." *Williams v. Taylor,* 529 U.S. 420, 431-32 (2000) (internal quotation marks and citations omitted) (referring to Webster's dictionary definitions to determine the meaning of a statutory term). The district court appropriately looked to the dictionary definitions of "restore" and "restoration," which include the following meanings: to give back, return, make restitution, reinstatement, renewal, and reestablishment. *Grand Traverse Band II,* 198 F. Supp.2d at 928 (citing Webster's at 1936). The court then correctly held that the Band clearly was a "restored tribe" under these definitions. The Band had treaties with the United States and a prior relationship with the Secretary of the Interior at least as far back as 1795. Until 1872, the Secretary had treated the Band as a recognized tribe. As the State concedes, the "United States unilaterally ceased to treat the Band as a federally-recognized tribe commencing in 1872, when Secretary of the Interior Columbus Delano improperly severed the government-to-government relationship between the United States and the Band." In 1980, the Secretary finally re-established the government-to-government relationship through the administrative "acknowledgment" process. As the district court concluded, this history of governmental recognition, withdrawal of recognition, and then reinstatement of recognition "fits squarely within the dictionary definitions of 'restore' and is reasonably construed as a process of restoration of tribal recognition." *Grand Traverse II,* 198 F. Supp.2d at 934. Thus, we hold that the Band is a tribe "restored to Federal recognition" under the plain language of 25 U.S.C. § 2719 (b)(1)(B)(iii).

The State attempts to evade the plain language of the "restoration of lands" exception by arguing that the term "restoration" has a distinct meaning when applied to Indian tribes and their trust status with the federal government – a meaning that precludes tribes like the Band from constituting a restored tribe when it has been re-recognized administratively through the "acknowledgment" process. The

State argues that Indian tribes inherently possess sovereignty, subject only to the plenary powers, and trust obligations, of the United States. The State further argues that an Indian tribe's trust relationship with the United States, once established by Congress, can be extinguished only by Congressional action and not by administrative action of the Secretary of the Interior. Moreover, when Congress has terminated that trust relationship, only Congress can restore it; the Secretary of the Interior has no power to restore trust status administratively through the acknowledgment process. The State points to a federal regulation providing that "groups which are, or the members of which are, subject to congressional legislation terminating or forbidding the Federal relationship may not be acknowledged" by the Secretary. 25 C.F.R. § 83.3(e).

The Band counters that a termination of tribal recognition can occur not only through Congressional legislation but also through a complete refusal of the federal government, which includes the executive branch, to treat the Band as a tribe. Thus, in 1872 and for the next hundred years, during which the Secretary of the Interior erroneously refused to treat the Band as a tribe, the Band suffered a *de facto* termination of the trust relationship, even though only Congress *legally* could terminate that relationship. Since the executive branch effectively could terminate the trust relationship, it also could restore it, which is what the acknowledgment process accomplished.

To support its view that the power to terminate the trust relationship of a Congressionally-recognized tribe lies exclusively with Congress, the State cites the First Circuit's decision in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975). In that case, the federal government argued, among other things, that the Passamaquoddy Tribe was equitably precluded from invoking the trust relationship purportedly established by Congress through the Indian Nonintercourse Act. The court rejected

this argument, holding that "once Congress has established a trust relationship with an Indian tribe, Congress alone has the right to determine when its guardianship shall cease." *Id.* at 380 (citing *United States v. Nice,* 241 U.S. 591, 598 (1916); *Tiger v. W. Investment Co.,* 221 U.S. 286, 315 (1911)). The tribe simply did not have the power to terminate the relationship. *Id.* The unremarkable holding in *Passamaquoddy,* however, is irrelevant to the instant case. There is no dispute that only Congress had the *legal* right to terminate the Band's recognition because Congress originally had recognized the Band. But the relevant question is whether a termination nevertheless took place because the executive branch of the government *illegally* acted as if the Band's recognition had been terminated, as evidenced by its refusal to carry out any trust obligations for over one hundred years.

A prominent treatise on federal Indian law states that federal recognition of a tribe requires (1) a legal basis for recognition (i.e. Congressional or Executive action) *and* (2) the empirical indicia of recognition, namely, a "continuing political relationship with the group, such as by providing services through the Bureau of Indian Affairs." Cohen, Handbook of Federal Indian Law 6 (1982). The First Circuit adopted Professor Cohen's test for tribal recognition in *Mashpee Tribe v. Sec'y of the Interior,* 820 F.2d 480, 484 (1st Cir. 1987) (Breyer, C.J.). *See also W. Shoshone Bus. Council v. Babbitt,* 1 F.3d 1052, 1056 (10th Cir. 1993) ("Historically, the federal government has treated a tribe as 'recognized' if Congress or the President has created a reservation for the group and the United States has a continuing political relationship with the group.") (citing Cohen, *supra*, at 6). The implication of Professor Cohen's two-part test, which we adopt today, is that the empirical acts that are tantamount to the termination of tribal recognition are analytically distinct from the legality of those acts, just as the empirical act of terminating an individual's employment (e.g., being told to

leave the workplace and never to return) is distinct from the legality of that act (e.g., a breach of contract).

Once tribal recognition is understood as having both legal and empirical elements, it becomes clear that the State's argument must fail. The State has conceded that "[t]he United States unilaterally ceased to treat the Band as a federally-recognized tribe commencing in 1872, when Secretary of the Interior Columbus Delano improperly severed the government-to-government relationship between the United States and the Band." In other words, acting through the Secretary of the Interior, the federal government terminated the political relationship with the group, in particular, the provision of services. Because the Department of Interior refused to recognize the Band as a political entity, "the Band experienced increasing poverty, loss of land base and depletion of the resources of its community," particularly when compared to those tribes that appeared on the Department of Interior's list of federally recognized tribes. *Grand Traverse Band II,* 198 F. Supp.2d at 924. Thus, the undisputed facts show that the federal government withdrew the Band's recognition in 1872 under the second factor of the Cohen test.[4]

---

[4]Indeed, the federal government admitted the Band's lack of recognition in 1979, one year before the Band was acknowledged by the Secretary of the Interior. In a 1979 brief filed in a case concerning the Band's fishing rights under a 1836 treaty, the United States argued,

> The problem with fishing rights for [the Grand Traverse Band of] Ottawas is that *there is no federally recognized tribal entity.* Without such an entity, the federal government must oppose the assertion of treaty fishing rights by individual Ottawas or unrecognized Ottawa groups.

Mem. of the United States Relating to Treaty Fishing Rights of Ottawa Indians, *United States v. Michigan,* No. M 26-73 (W.D. Mich.), at 2 (attached as Appendix 1 to *Appellee's Br.*) (emphasis added).

Since the Secretary of the Interior had the power to terminate the Band's federal recognition, he also had the power to restore that recognition. That is exactly what the Secretary did in 1980 through the newly-promulgated acknowledgment process, which "applies only to those American Indian groups indigenous to the continental United States which are not currently acknowledged as Indian tribes by the Department" of the Interior and who have not been subject to federal legislation that expressly terminated the federal relationship. 25 C.F.R. §§ 83.3(a), 83.3(e), 83.7(g). The result of this administrative acknowledgment was a restoration of federal recognition, a necessary component of which includes the resumption of the government's political relationship with the Band. Contrary to the State's position, the restoration of federal recognition was not contingent on Congressional action, because it was administrative action that terminated the recognition in the first place. On the facts of this case, a tribe like the Band, which was administratively "acknowledged," also is a "restored" tribe.

The State persists in arguing that an administratively "acknowledged" tribe like the Band cannot simultaneously be a "restored" tribe by pointing to statutory language Congress has employed in other legislation concerning Indians. The State argues that Congress has consistently used the term "restored" to describe the legislative reestablishment of government-to-government relations with tribes whose trust status had previously been terminated by Congressional action. In contrast, argues the State, Congress has used the term "affirmed" when recognizing tribes, such as the Pokagon Band of Potawatomi Indians, that had never been the subject of Congressional termination. *E.g.,* 25 U.S.C. §§ 1300j, 1300j-1.

Congress, however, has not consistently referred to legislatively terminated-and-later-recognized tribes as "restored" tribes. When Congress reversed its legislative termination of the Menominee Tribe, it provided that federal

recognition was "extended" to the Tribe. 25 U.S.C. § 903a(a). Congress also reversed its legislative terminations of three other tribes by providing that federal recognition was "extended or confirmed" to those tribes. *Id.* § 861(a), (b). Finally, although Congress used the term "affirmed" when it legislatively recognized the Pokagon Band, whose trust status had not previously been terminated by Congress, the report of the Senate Committee on Indian Affairs that accompanied the legislation stated,

> The Committee concludes that the Band was not terminated through an act of the Congress, but rather the Pokagon Band was unfairly terminated as a result of both faulty and inconsistent administrative decisions contrary to the intent of Congress, federal Indian law and the trust responsibility of the United States.…The Band's claim of rights and status as a treaty-based tribe, and the need to *restore* and clarify that status has been clearly demonstrated.

S. Rep. No. 103-266 at 6 (1994) (emphasis added). This language not only confirms the above conclusion that an executive agency can terminate the recognition of a Congressionally-recognized tribe, but also shows that Congress did not intend to meaningfully distinguish the word "affirmed" from "restored." Thus, the district court correctly concluded that "the State has failed to demonstrate that Congress consistently and exclusively used only the word "restore" when restoring Indian tribes through legislative action." *Grand Traverse Band II,* 198 F. Supp.2d at 930.

The State next argues that the structure of the exceptions set forth in § 2719 evidence Congressional intent that an "acknowledged" tribe cannot also be a "restored" tribe. As noted above, the general prohibition against casino-style gaming on tribal lands acquired after October 17, 1988 does not apply when (1) the Secretary of the Interior has made a determination that a gaming establishment would be in the

best interest of the Indian tribe and not detrimental to the surrounding community, *and* the Governor has concurred in the Secretary's determination; (2) the lands were taken into trust as part of a settlement of a land claim; (3) the lands were taken into trust as part of the initial reservation of an Indian tribe acknowledged by the Secretary under the federal acknowledgment process; *or* (4) the lands were taken into trust as part of the restoration of lands for an Indian tribe that is restored to federal recognition. 25 U.S.C. § 2719(b)(1). The State argues that the "acknowledged tribe" exception and the "restoration of lands" exception are expressly limited to either "acknowledged" or "restored" tribes, respectively, and that the two exceptions are mutually exclusive. The State further argues that if such overlap is permitted, the "acknowledged tribe" exception is relegated to mere surplusage, because any lands established as the initial reservation of an acknowledged tribe also qualify as restored lands for a restored tribe under the "restoration of lands" exception. According to the State, no tribe would ever resort to the "acknowledged tribe" exception because it could invoke the more liberal provisions of the "restoration of lands" exception.

The State's arguments lack merit. As stated above, a tribe like the Band, which has had its federal recognition terminated by administrative action or inaction, can be restored to federal recognition through the administrative acknowledgment process. Thus, it is possible for a tribe to be both "restored" and "acknowledged." Moreover, the district court did not hold that every acknowledged tribe automatically constitutes a restored tribe. In fact, the court noted that there will be situations where there is no overlap, such as when the Secretary of the Interior has acknowledged a tribe that had never previously been recognized by the federal government. *Grand Traverse Band II,* 198 F. Supp.2d at 932. *See also* 69 Fed. Reg. 550-01 (Feb. 5, 2004) (administrative acknowledgment of the Schaghticoke Tribal Nation, which was never Congressionally-recognized); 67

Fed. Reg. 44234-02 (July 1, 2002) (administrative acknowledgment of the Eastern Pequot Tribe, which was never Congressionally-recognized). Such a tribe might be able to invoke the "acknowledged tribe" exception, but not the "restoration of lands" exception, because the tribe's federal recognition, which was never lost in the first place, cannot, by definition, be restored. Also, a tribe that is restored through legislative action, as opposed to the administrative "acknowledgment" process, cannot, by statutory definition and administrative regulations, invoke the "acknowledged tribe" exception. Thus, the "acknowledged tribe" exception is not rendered mere surplusage simply because a tribe like the Band might be able to invoke another exception as well.

Finally, even assuming, *arguendo,* that the State has "muddied the waters" with respect to the meanings of the terms "restored" and "acknowledged," the Supreme Court repeatedly has held that "'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Chickasaw Nation v. United States,* 534 U.S. 84, 94 (2001) (quoting *Montana v. Blackfeet Tribe,* 471 U.S. 759, 766 (1988)). This canon is "rooted in the unique trust relationship between the United States and the Indians." *Blackfeet Tribe,* 471 U.S. at 766 (internal quotation marks and citations omitted). The force of this interpretive canon can be overcome only when "other circumstances evidencing congressional intent" demonstrate that "the statute is 'fairly capable' of two interpretations… [or] that the [conflicting] interpretation is fairly 'possible.'" *Chickasaw Nation,* 534 U.S. at 94 (citing *Blackfeet Tribe,* 471 U.S. at 766).

The State has pointed to no evidence of Congressional intent that would forbid this Court from invoking the canon of statutory construction applied to statutes affecting Indians and their trust relationship with the United States. Indeed, the only evidence of intent strongly suggests that the thrust of the IGRA is to promote Indian gaming, not to limit it. *See*

25 U.S.C. § 2702(1) (providing that the purpose of the statute is to provide a statutory basis for gaming by Indian tribes "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments"). Although § 2719 creates a presumptive bar against casino-style gaming on Indian lands acquired after the enactment of the IGRA, that bar should be construed narrowly (and the exceptions to the bar broadly) in order to be consistent with the purpose of the IGRA, which is to encourage gaming. *Cf. City of Roseville v. Norton,* 348 F.3d 1020, 1030-32 (D.C. Cir. 2003) (holding that the "restoration of lands" exception should be interpreted broadly because the IGRA's exceptions "embody policies counseling for a broader reading" due to the statute's general purpose of promoting tribal economic development and self-sufficiency; also applying the Indian canon of statutory construction to resolve any ambiguities in favor of a broad reading of the "restoration of lands" exception).

### III

For all the foregoing reasons, the district court properly found that the Grand Traverse Band of Ottawa and Chippewa Indians is an Indian tribe that is restored to federal recognition under the Indian Gaming Regulatory Act, 25 U.S.C. § 2719(b)(1)(B)(iii). The district court's order of April 22, 2002 is therefore **AFFIRMED**.